# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED
Oct 23, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

United States of America
v.
FIDEL VASQUEZ; XAVIER MEDRANO, FNU LNU, AKA “BRONCO”, AKA “LUIS”; GUSTAVO PLASCENCIA-MUNOZ; ARTURO LEON; HECTOR AVELAR

*Defendant(s)*

Case No. **1:26-mj-00126-EPG**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of Various in the county of Fresno, Tulare, and Kings in the Eastern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| See Attached Penalty Slips | |

This criminal complaint is based on these facts:

See Attached Affidavit of DEA SA Shawn Riley, attached hereto and incorporated herein.

☑ Continued on the attached sheet.

[signature]
*Complainant’s signature*

Shawn Riley, DEA Special Agent
*Printed name and title*

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed.R.Crim. P. 4.1 and 41(d)(3).

Date: **Oct 23, 2026**

[signature]
*Judge’s signature*

City and state: Fresno, California

Hon. Erica P. Grosjean, U.S. Magistrate Judge
*Printed name and title*

ERIC GRANT
United States Attorney
ANTONIO J. PATACA
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
Plaintiff,

v.

FIDEL VASQUEZ;
XAVIER MEDRANO, AKA "VIEJO";
FIRST NAME UNKNOWN, LAST NAME UNKNOWN, AKA "BRONCO", AKA "LUIS", (UM9106);
GUSTAVO PLASCENCIA-MUNOZ;
ARTURO LEON;
HECTOR AVELAR;
Defendants.

CASE NO.

AFFIDAVIT IN SUPPORT OF COMPLAINT

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

I. INTRODUCTION AND AGENT BACKGROUND....4

A. Purpose of Affidavit....4

B. Agent Experience....4

C. Summary of Investigation....7

D. Defendants....9

E. VASQUEZ Distributes Methamphetamine....10

1. Initial Communications with VASQUEZ Arranging a Methamphetamine Transaction....10

2. VASQUEZ Distributes Methamphetamine on July 15, 2026 During a Controlled Purchase ....12

F. VASQUEZ Distributes Methamphetamine ....15

1. VASQUEZ Distributed Methamphetamine on August 14, 2025 During a Controlled Purchase ....15

G. VASQUEZ Distributes Methamphetamine to Co-conspirators....17

1. Intercepted Communications with VASQUEZ Arranging a Methamphetamine Transaction....17

2. VASQUEZ Distributes Methamphetamine to Co-conspirators on December 6, 2025 ....18

H. VASQUEZ Distributes Methamphetamine to Co-conspirators....19

1. Intercepted Communications and VASQUEZ Distributes Methamphetamine to Co-conspirators on December 14, 2025 ....19

I. VASQUEZ and MEDRANO Distribute Methamphetamine....20

1. Recorded and Intercepted Communications with VASQUEZ and MEDRANO Arranging a Methamphetamine Transaction ....20

2. VASQUEZ & Co-conspirators Distributed Methamphetamine on November 28, 2025 During a Controlled Purchase....25

J. MEDRANO Distributes Fentanyl to Hector AVELAR....28

1. Surveillance and Arrest of Hector AVELAR on November 30, 2025 ....28

K. MEDRANO Distributes Methamphetamine to Arturo LEON ....29

1. Intercepted Communications, Surveillance and Arrest of Arturo LEON on December 2, 2025 ....29

L. UM9106 & Gustavo PLASCENCIA Distribute Methamphetamine....33

1. Intercepted Communications, Surveillance and Delivery of Methamphetamine to a Co-conspirator....33

M. UM9106 Distributes Methamphetamine....37

1. Intercepted Communications, Surveillance and Delivery of Methamphetamine to a Co-conspirator....37

N. UM9106 Distributes Methamphetamine....41

1. Intercepted Communications, Surveillance and Delivery of Methamphetamine to a Co-conspirator....41

O. PLASCENCIA Transports Methamphetamine....44

1. Intercepted Communications, Surveillance and Other Information Confirming PLASCENCIA was Involved in the Transportation of Methamphetamine....44

2. Arrest of PLASCENCIA on September 22, 2026 while Transporting Suspected Methamphetamine ....49

II. REQUEST FOR SEALING....50

III. CONCLUSION....50

I, Shawn Riley being first duly sworn under oath, depose and say:

## I. INTRODUCTION AND AGENT BACKGROUND

### A. Purpose of Affidavit

1. I make this Affidavit to support a complaint charging:

a) **Fidel VASQUEZ (VASQUEZ)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a).

b) **Xavier MEDRANO, aka "Viejo", (MEDRANO)** with conspiracy to distribute and possess with intent to distribute methamphetamine and fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(a).

c) **First Name Unknown, Last Name Unknown, aka "BRONCO", aka "Luis", (UM9106)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a).

d) **Gustavo PLASCENCIA-Munoz, (PLASCENCIA)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a).

e) **Arturo LEON (A. LEON)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a).

f) **Hector AVELAR (AVELAR)** with conspiracy to distribute and possess with intent to distribute fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(a).

### B. Agent Experience

2. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I am a Special Agent (SA) of the United States Department of Justice, Drug Enforcement Administration (DEA). I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed as a Special Agent with the Drug Enforcement Administration (DEA) since January 2004 and am presently assigned to the DEA District Office in Fresno, California. I have successfully completed a sixteen (16) week DEA Basic Agent Training Academy at the Drug Enforcement Administration Academy in Quantico, Virginia. This training included instruction in the investigation of federal drug violations, including, but not limited to, Title 21, United States Code, Sections 841(a)(1) and 846. I have assisted in numerous narcotics investigations that have led to the seizure of narcotics and the arrests of numerous individuals. I have used various methods of investigation including but not limited to physical surveillance, electronic surveillance, phone toll analysis, records research, executed search warrants, trash searches, photo and video analysis, interviews of confidential informants, defendants and witnesses. I have discussed with law enforcement officers, cooperating defendants, and informants, the methods and practices used by narcotics distributors. I am a law enforcement officer as defined by federal statutes. In addition, I have completed various training provided by the DEA and local law enforcement agencies, including, but not limited to training on identifying characteristics associated with the manufacture, sale, and transportation of various narcotics, including, but not limited to phencyclidine (PCP), methamphetamine, heroin, cocaine, fentanyl and marijuana. This training involved the use, possession, packaging, sale, concealment, manufacturing, and transportation of various controlled substances as well as its precursors and chemicals used in the manufacturing process.

4. I have participated in narcotics investigations either as a case agent or in a supporting role. I have assisted on the execution of several federal and state narcotics search warrants that resulted in the arrest of suspects and seizure of narcotics. I have debriefed multiple defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations. Additionally, I have participated in many aspects of drug investigations including but not limited to, undercover operations, conducting physical and electronic surveillance, and arrests. I have conducted and been involved in investigations regarding the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well as conspiracies associated with controlled substance offenses, in violation of Title 21, United States Code, §§ 841(a)(1), 841(c)(2), 843, and 846. As a result,

I am familiar with narcotics traffickers' methods of operation including the distribution, storage, manufacturing, and transportation of narcotics and the collection of money proceeds of narcotics trafficking.

5. During several prior investigations, I have monitored, conducted wire room supervision, and conducted surveillance on federal wiretap investigations. During these investigations, I have had the opportunity to monitor, listen to, review transcripts or "line sheets" or monitor logs prepared by linguists and/or otherwise discussed with linguists the content of intercepted drug related conversations. Most of these intercepted communications contained coded language used by the participants to cloak their intentions and thwart law enforcement. During these investigations, I obtained information from other law enforcement officers who are familiar with intercepted coded language, as well as confidential sources and defendants who were intercepted and/or arrested during wiretap investigations. Information from these sources has confirmed my understanding of intercepted coded language.

6. Through prior investigations, conversations with other law enforcement officers and training, I have become familiar with the types and amounts of profits made by drug traffickers, and the methods, language, and terms used by persons dealing in such contraband. I am aware drug traffickers often communicate with their Co-conspirators and criminal associates through the use of cellular telephones. In addition, I am aware drug traffickers frequently use multiple cellular telephones. I am aware drug traffickers frequently change telephone numbers and cellular telephones. I know from my training and experience; drug traffickers often use fictitious names and identification for the purpose of subscribing to cellular telephones and hardline telephones. I also know drug traffickers put communications devices in the names of associates and/or relatives. The use of fictitious names and identification or placing communication devices in the names of associates or relatives is designed to impede law enforcement investigations into the true subscriber and/or user of such communication devices.

7. Some members of this drug trafficking organization (DTO) speak Spanish, and occasionally utilize the Spanish language to communicate with each other. Throughout this investigation, linguists and Spanish-speaking members of the investigative team have assisted me in translating communications between DFTO members.

8. I make this affidavit, in part, based on personal knowledge derived from my participation in this and past investigations and in part, upon discussion of facts and information developed by other agents/detectives involved in this investigation. The information contained in this affidavit is based upon my personal observations and training and, where noted, information related to me by other law enforcement officers and/or agents.

9. Because this Affidavit is being submitted for the limited purpose of securing complaints for the named subjects, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe establish probable cause that evidence of the violations further described above in paragraph 1 have been committed.

### C. Summary of Investigation

10. Beginning June 2025, a confidential source, referred to during this investigation as CS2, began conducting recorded communications with Fidel **VASQUEZ** who was using phone number 559-736-8111 (Target Telephone 1)[1]. At the direction of controlling agents, CS2 represented himself/herself as a methamphetamine customer during recorded communications with **VASQUEZ**. **VASQUEZ**, in turn, offered to supply CS2 with methamphetamine. The negotiations resulted in three controlled purchases[2] of methamphetamine from **VASQUEZ**. From information developed from the controlled purchases, as well as other investigative techniques, agents identified Xavier **MEDRANO** and **UM9106** as methamphetamine sources of supply for **VASQUEZ**. Gustavo **PLASCENCIA** was identified as

[1] During this investigation and at the direction of controlling agents, CS2 conducted multiple recorded phone and text communications with **VASQUEZ**. These recorded communications included both text and phone calls. The communications between CS2 and **VASQUEZ** were recorded on a law enforcement recording system which captures the phone number being used by **VASQUEZ**, the date and time of the communication, as well as the content of the communications. I know this law enforcement system recording to be accurate due to the use of the system in prior investigations and because information from the system was corroborated when compared to CDRs from the respective phone numbers used by **VASQUEZ**.

[2] A controlled purchase is a technique used by law enforcement to confirm a target of investigation is involved in the distribution of contraband. During this investigation, controlled purchase of drugs have been conducted. The process of conducting a controlled purchase differs between law enforcement agencies but usually includes the following common practices. Prior to the controlled purchase, controlling agents/detectives met with a confidential source at a pre-arranged meeting location. During this meeting, the confidential source and, if applicable, his/her vehicle would be searched. The confidential source will be provided with government funds to purchase the controlled substances. The confidential source will then be maintained under surveillance as they conduct the transaction with a target of investigation during which the confidential source will exchanged government funds for drugs. The confidential source will then be followed by surveillance back to the prearranged meeting location. Upon returning to the prearranged meeting location, the purchased drugs will be seized as evidence and the confidential source and vehicle will be searched a second time.

**UM9106**'s brother and was involved in the transportation of methamphetamine to this drug trafficking organization (DTO). Arturo **LEON** and Hector **AVELAR** were arrested during this investigation after departing **MEDRANO**'s residence with controlled substances believed to be supplied by him (**MEDRANO**).

11. As the investigation progressed, a series of federal wire intercepts were initiated on targets of this investigation, referred to as Target Subjects, based on probable cause that the Target Subjects were engaged in the following Target Offenses:

a) Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1);

b) Distribution and Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1);

c) Unlawful Use of a Communication Facility to Facilitate Felony Drug Violations, in violation of Title 21, United States Code, Section 843(b); and

d) Violations involving financial transactions and the transportation, transmission, or transfer of monetary instruments that represent the proceeds derived from the manufacture, sale, or distribution of a controlled substance, in violation of 18 U.S.C. Section 1956; and conspiracy to commit the above offenses, in violation of 18 U.S.C. Section 1956(h); and engaging or attempting to engage in monetary transactions of criminally derived property, in violation of 18 U.S.C. Section 1957.

12. During the course of this investigation, three wire intercepts were initiated and are further described as follows.

a) On November 24, 2025, the Honorable Jennifer L. Thurston, US District Court Judge for the Eastern District of California, signed Wire Intercept 1:25-SW-0247-JLT which authorized the interception of wire and electronic communications to and from phone number 559-736-8111 (Target Telephone 1) used by **VASQUEZ** and 559-619-1576 (Target Telephone 2) used by **UM9106**. Interceptions began on November 25, 2025, and terminated on December 24, 2025.

b) On March 6, 2026, Judge Thurston signed Wire Intercept 1:26-SW-0018-JLT authorizing the interception of wire and electronic communications to and from phone numbers 559-870-

9106 (Target Telephone 3) used by **UM9106**, 559-899-4023 (Target Telephone 4) used by **MEDRANO**, and electronic communications to and from 559-334-5819 (Target Telephone 5) which is also used by **MEDRANO**. Interceptions began on March 9, 2026. The Wire Intercept on Target Telephone 5 terminated on March 30, 2026. The Wire Intercept on Target Telephones 3 and 4 terminated on April 7, 2026.

c) On September 2, 2026, Judge Thurston signed Wire Intercept 1:26-SW-00108-JLT authorizing the interception of wire and electronic communications to and from phone number 559-991-5368 (Target Telephone 6) used by **UM9106** and wire communications to and from phone number 559-940-2548 (Target Telephone 7) used by **PLASCENCIA**. Interception began on September 3, 2026. The interception of Target Telephone 7 terminated on September 24, 2026, after the arrest of **PLASCENCIA**. The interception of Target Telephone 6 terminated on October 2, 2026.

**D. <u>Defendants</u>**

13. **Fidel VASQUEZ (VASQUEZ)** is a methamphetamine source of supply and the user of phone number 559-736-8111 (Target Telephone 1), a Target Telephone intercepted during Wire Intercept 1:25-SW-0247-JLT. During this investigation, **VASQUEZ** supplied methamphetamine during three controlled purchases and also supplied methamphetamine to various customers during the course of Wire Intercept 1:25-SW-0247-JLT.

14. **Xavier MEDRANO, aka "Viejo", (MEDRANO)** is a methamphetamine and fentanyl source of supply and the user of phone numbers 559-899-4023 (Target Telephone 4) and 559-334-5819 (Target Telephone 5), Target Telephones intercepted during Wire Intercept 1:26-SW-0018-JLT. During this investigation, **MEDRANO** supplied methamphetamine and fentanyl to various Co-conspirators.

15. **UM9106, aka "BRONCO" and "Luis", (UM9106)** is a methamphetamine source of supply and the user of phone numbers 559-619-1576 (Target Telephone 2), 559-870-9106 (Target Telephone 3), and 559-991-5368 (Target Telephone 6), which were Target Telephones intercepted during Wire Intercepts 1:26-SW-0018-JLT, 1:26-SW-0018-JLT, and 1:26-SW-00108-JLT. During this investigation, **UM9106** supplied methamphetamine to various Co-conspirators.

16. **Gustavo PLASCENCIA-Munoz, (PLASCENCIA)** is a methamphetamine transporter and the user of phone number 559-940-2548 (Target Telephone 7) which was a Target Telephone intercepted during Wire Intercept 1:26-SW-00108-JLT. During this wire intercept, **PLASCENCIA** was involved in at least three incidents of transporting methamphetamine to Visalia, CA which was then distributed to multiple Co-conspirators by his brother, **UM9106**.

17. **Arturo LEON (A. LEON)** is a methamphetamine transporter who was arrested on December 2, 2025, with approximately four pounds of methamphetamine which was supplied by **MEDRANO**.

18. **Hector AVELAR (AVELAR)** is a fentanyl transporter who was arrested with approximately one kilogram of fentanyl which was supplied by **MEDRANO**.

## E. VASQUEZ Distributes Methamphetamine

### 1. Initial Communications with VASQUEZ Arranging a Methamphetamine Transaction

19. Beginning July 14, 2025, and at the direction of controlling agents, a confidential source, hereafter referred to as CS2[3], began conducting recorded communications with **VASQUEZ** who was using Target Telephone 1.[4][5]

[3] During this investigation, CS2 has provided information to law enforcement in regard to Target Subjects' identities, associated phone numbers, vehicles used, as well the Target Subjects' criminal roles in this DTO. CS2 has conducted recorded communications with **VASQUEZ**, conducted recorded meetings with **VASQUEZ**, and successfully completed two controlled purchases of methamphetamine from **VASQUEZ**. CS2 was cooperating with law enforcement for judicial consideration on pending federal drug related charges. CS2's criminal history includes multiple arrests and convictions which are described as follows. A juvenile convictions for carrying a loaded firearm in public, possession of a controlled substance, possession of a controlled substance for sale, use/under influence of a controlled substance; a juvenile conviction for carrying a loaded firearm in public; a conviction for possession of a controlled substance for sale; a conviction for sell/etc liquor to a minor, a conviction for possession of marijuana for sale; an arrest for possession of marijuana for sale, and an arrest for possession with intent to sell methamphetamine and conspiracy. CS2 has a significant criminal history, which bears on his/her credibility, however, I have concluded that the information that he/she has provided during this investigation is accurate for the following reasons: CS2 has provided reliable information in other unrelated drug related investigations which has resulted in the seizure of controlled substances and the arrest of drug traffickers. The information provided by CS2 has been corroborated by other sources and investigative means. Primarily, the information provided by CS2 regarding **VASQUEZ** participation in this conspiracy has been corroborated by numerous recorded communications, direct surveillance, the controlled purchase of methamphetamine, and CDR analysis. For these reasons, I consider CS2's information listed in this affidavit to be accurate

[4] The recorded communications, which included both voice and text communications, occurred over a law enforcement program which captured and preserved as evidence, the dialed digits of the phone number in communication with CS2, the date and time of the communications, as well as the communications content which consisted of voice recordings and written text message content.

[5] **VASQUEZ** is believed to be the user of Target Telephone 1 based on the following information. **VASQUEZ** is the subscriber of Target Telephone 1. A search of a law enforcement database showed **VASQUEZ** sent twelve money

20. On July 14, 2025, at approximately 1:03 PM, a recorded phone call occurred from **VASQUEZ** using Target Telephone 1 to CS2. Initially during this phone call, CS2 and **VASQUEZ** greeted each other and discussed where to meet the following day (July 15, 2025) to conduct a transaction. During this discussion, **VASQUEZ** and CS2 agreed to meet at the Loves Truck Stop located on Paige Ave., west of Hwy 99, in Tulare, CA. **VASQUEZ** described his residence by stating, "So you can stop…I'm, I'm, I'm equivalent to one mile, I'm equivalent to one mile from Loves, but I'm, uh, north of Loves." This description is consistent with 1261 S. Marion St., Tulare, CA, **VASQUEZ**'s identified residence. Later, during the conversation, **VASQUEZ** and CS2 had the following exchange:

| | |
|---|---|
| **VASQUEZ** | [U/I], ok, well, anyways, what are you looking for? |
| CS2 | Uh, a couple, a pair. |
| | [Voices overlap] |
| **VASQUEZ** | Just two? |
| CS2 | Yeah, for now. |
| **VASQUEZ** | Two? Ok, twenty-four. |
| CS2 | Ok. |
| **VASQUEZ** | He told you already if you get four, you can get them for eleven, right? |
| CS2 | Yes. |
| **VASQUEZ** | Yeah, ok, I got to wait till you get here. I got to get the money and then go get it. |
| CS2 | Ok then. |
| | [Voices overlap] |
| **VASQUEZ** | Ok, just let me know when your in town. |
| | [Voices overlap] |

transfers between September 12, 2024 and August 12, 2025 during which he listed Target Telephone 1 as his phone number. Target Telephone 1 is listed in the Tulare Police Department database as a contact for **VASQUEZ** based on prior police contacts. Lastly, and as will be described in more detail below, multiple recorded communications occurred with **VASQUEZ** using Target Telephone 1 during this investigation. During these recorded communications, **VASQUEZ** agreed to supply methamphetamine to CS2 and was subsequently observed by surveillance on two occasions completing the negotiated methamphetamine transactions. Based on this information, **VASQUEZ** is believed to be the user of Target Telephone 1.

| | |
|---|---|
| CS2 | Ok then. |
| **VASQUEZ** | Your going to be here tomorrow? |
| CS2 | Uh, I'll let you know. I don't want to be, you know, [U/I] |
| **VASQUEZ** | I know exactly, I know exactly what you're talking about. |
| CS2 | All right then. |
| **VASQUEZ** | Just hit me, just hit me up. |
| CS2 | Ok then bro. |
| **VASQUEZ** | Ok, by. |
| | [END OF CALL] |

21. During this portion of the phone call, **VASQUEZ** asked CS2, "what are you looking for." CS2 used the term "a pair" and "a couple" to refer to two pounds of methamphetamine. In response, **VASQUEZ** quoted a price of "twenty-four", or $2,400. Based on my training, experience, information from other recent methamphetamine sales investigations, and conversations with other law enforcement officers, I know that a unit price of $1,200 is consistent with the current illicit price for one pound of methamphetamine in the Central Valley of California. Therefore, $2,400 is a consistent price for two pounds of methamphetamine, the amount ordered by CS2 from **VASQUEZ**. **VASQUEZ** then quoted a unit price of "eleven", or "$1,100", if CS2 purchased a quantity of "four." I believe that **VASQUEZ** was referring to a cost of $1,100 per pound if CS2 purchases four or more pounds of methamphetamine. This is consistent with the principle of purchasing a commodity in bulk where the unit cost decreases if the quantity of methamphetamine transacted increases. **VASQUEZ** and CS2 agreed to call each other later.

22. After this phone call, additional recorded communications occurred between **VASQUEZ** using Target Telephone 1 and CS2 to further negotiate and arrange this methamphetamine transaction. These communications were primarily regarding **VASQUEZ** wanting to receive money prior to delivering the methamphetamine, as well as agreeing on the location where to conduct the transaction.

**2. VASQUEZ Distributes Methamphetamine on July 15, 2026 During a Controlled Purchase**

23. On July 15, 2025, at approximately 1:47 PM, a recorded phone call occurred from

**VASQUEZ** using Target Telephone 1 to CS2. During this phone call, CS2 referenced being in a truck and not being able to go into town. This was an investigative technique during which CS2 represented himself/herself as being in a truck and trailer and therefore not able to stop except for gas stations off of Highway 99. **VASQUEZ** at first was confused by CS2's statement and made sure CS2 wanted to talk to him, specifically self-identifying as "Fidel." When CS2 confirmed who he/she wanted to speak to, **VASQUEZ** agreed to the meeting location by stating, "that's fine." Later in the conversation, **VASQUEZ** informed CS2, "I got those already" and "I picked up three of them." Based on my training, experience, and the context of this conversation with earlier recorded communications, I believe that **VASQUEZ** was referring to being in possession of three pounds of methamphetamine, two of which were for CS2. CS2 agreed to purchase the methamphetamine by telling **VASQUEZ** to "hold them" until CS2 arrived. **VASQUEZ** agreed by stating, "Yeah, I got them for you man." CS2 then informed **VASQUEZ** that he/she would cancel on a third party and would pick up the methamphetamine from **VASQUEZ** instead. The call concluded by **VASQUEZ** and CS2 agreeing to call each other later.

24. At approximately 2:51 PM, a text message was sent to **VASQUEZ** using Target Telephone 1 from CS2 stating, "I cancelled on the other guy so ima need the pair." CS2 then immediately sent a second text to **VASQUEZ** stating, "I should be in your area around 5:30 6 depending on traffic."

25. Based on the prior communications, I know that "the pair" referred to two pounds of methamphetamine previously negotiated with **VASQUEZ**. Furthermore, CS2 was informing **VASQUEZ** that he/she would be present around 5:30 PM or 6:00 PM to conduct the methamphetamine transaction.

26. In anticipation of a controlled purchase of two pounds of methamphetamine from **VASQUEZ**, controlling law enforcement personnel met with CS2 and provided him/her with $2,400 in government funds to complete the transaction. CS2 was then situated at the Flying J Truck Stop which is located just west of the Loves Truck Stop previously discussed.

27. Also in anticipation of the controlled purchase, a temporary remote controlled video surveillance camera was installed in the area of **VASQUEZ**'s residence of 1261 S. Marion St., Tulare, CA. At approximately 6:26 PM, via the remote-controlled video surveillance camera, a male hereinafter

referred to as "Co-conspirator 1" was observed by surveillance departing 1261 S. Marion St., Tulare, CA driving a white Chevrolet work truck with CA license plate #7G06682. This vehicle is registered to **VASQUEZ** with a listed address of 1261 S. Marion St., Tulare, CA.

28. Minutes later, surveillance observed the Chevrolet work truck travel to and park in the area of 658 W. Beacon Ave., Tulare, CA, a residence in the Matheny Tract neighborhood of Tulare, CA.

29. Minutes later, surveillance observed the Chevrolet work truck departed this area and park at the Paige Truck Stop located at 1297 E. Paige Ave., Tulare, CA. This truck stop is approximately one quarter mile east of the Flying J Truck Stop, where the CS2 was waiting to conduct the transaction with **VASQUEZ**. Viewing surveillance video from the truck stop, investigators observed a short car to car exchange during which a bag was passed from the driver side of the Chevrolet work truck to the driver side of **VASQUEZ**'s white Nissan Altima with CA license plate #8AJJ743. The Nissan Altima is registered to **VASQUEZ** with a listed address of 1261 S. Marion St, Tulare, CA. This observation is consistent with Co-conspirator 1 transporting methamphetamine from 658 W. Beacon Ave., Tulare, CA to the Paige Truck Stop and then supplying the methamphetamine to **VASQUEZ** who was in the white Nissan Altima. **VASQUEZ** was confirmed to be the driver of the Nissan Altima because, immediately after this car to car exchange, **VASQUEZ** was observed in the Nissan Altima by surveillance during a recorded meeting with CS2.

30. Additional recorded communications occurred between **VASQUEZ** using Target Telephone 1 and CS2 during which CS2 provided his/her location and inquired on how long **VASQUEZ** would take to arrive and complete the transaction. During this exchange, **VASQUEZ** indicated he would arrive in 20 minutes. CS2 complained that he/she had been waiting an hour and **VASQUEZ** reassured CS2 that he would be there "in a minute."

31. At approximately 6:55 PM, a recorded phone call occurred from **VASQUEZ** using Target Telephone 1 to CS2. During this phone call, **VASQUEZ** stated that he was at the signal light and asked where CS2 was at. CS2 stated that he/she was in the "Wendy's", a reference to a Wendy's restaurant within the Flying J Truck Stop. **VASQUEZ** stated that he was in a "white Nissan Altima." CS2 indicated he/she saw **VASQUEZ** and told **VASQUEZ** to park by the gas station.

32. At approximately the same time as this phone call, surveillance observed the Nissan

Altima arrive and park in the Flying J parking lot near the front of the Wendy's restaurant. **VASQUEZ**[6] was identified by surveillance as the driver of this vehicle and a white female was the front passenger. Surveillance observed CS2 exit from Wendy's restaurant and enter the back passenger seat of **VASQUEZ**'s vehicle.

33. At this time, a recorded meeting occurred between CS2, **VASQUEZ**, and the female passenger of the car. During their conversations, CS2 asked **VASQUEZ** how much, asking if it was "twenty-four." **VASQUEZ** responded, "twenty-four, yeah." CS2 then exchanged $2,400 in government funds for two pounds of methamphetamine handed to him/her by **VASQUEZ**. After the exchange, CS2 asked, "we good, alright man" and **VASQUEZ** responded, "yeah." The meeting subsequently concluded and CS2 left **VASQUEZ**' vehicle. After the transaction, CS2 was maintained under surveillance until controlling agents could meet with him/her and take custody of the purchased methamphetamine. The methamphetamine was weighed and determined to be approximately two pounds. The methamphetamine was submitted to the DEA Western Regional Laboratory, analyzed, and confirmed to be methamphetamine.

### F. VASQUEZ Distributes Methamphetamine

#### 1. VASQUEZ Distributed Methamphetamine on August 14, 2025 During a Controlled Purchase

34. After the initial controlled purchase, recorded communications continued between **VASQUEZ** using Target Telephone 1 and CS2 to arrange a second transaction. This second transaction was arranged for August 14, 2025, with **VASQUEZ** increasing the price per pound of methamphetamine to $1,500.

35. On August 14, 2025, at approximately 7:20 PM, a recorded phone call occurred to **VASQUEZ** using Target Telephone 1 from CS2. During this phone call, CS2 advised that he/she was there. **VASQUEZ** confirmed, "the gas station." CS2 agreed and stated it was the same place they met last time. **VASQUEZ** stated that he was going to park by the gas pumps in his "work truck."

---

[6] During this investigation, **VASQUEZ**'s CA DMV photograph was obtained and disseminated to the investigative team. This identification was done by comparing **VASQUEZ**'s DMV photo to the surveillance video, resulting in the positive identification.

**VASQUEZ** further described his work truck as "a white one with a utility box and got ladders on top." **VASQUEZ** stated that he would pull into the "first gas pump."

36. Based on this phone call, it was anticipated that **VASQUEZ** would be delivering the methamphetamine to the Flying J Travel Center located at 979 E. Paige Ave, Tulare, CA in his Chevrolet work truck.

37. In anticipation of this controlled purchase, surveillance had been established at **VASQUEZ**' residence of 1261 S. Marion St., Tulare, CA. At approximately 7:28 PM, surveillance observed **VASQUEZ** depart his residence in a white Chevrolet work truck and subsequently arrive at the Flying J Travel Center at approximately 7:37 PM. Upon arrival, **VASQUEZ** used Target Telephone 1 to send CS2 a text message stating, "I'm here."

38. CS2 walked to **VASQUEZ**'s work truck and conducted an audio/video recorded meeting. During the meeting, CS2 asked **VASQUEZ**, "where is it?", a reference to the two pounds of methamphetamine to be transacted. **VASQUEZ** responded, "In the back of the truck, in that, in a, in a paper bag, in a plastic bag, in a bucket." CS2 and **VASQUEZ** then repositioned to the rear of the work truck and **VASQUEZ** stated, "right here." CS2 retrieved a paper bag from the rear of **VASQUEZ**'s work truck which contained two pounds of methamphetamine. After additional conversation between **VASQUEZ** and CS2, CS2 placed $3,000 in government funds in the passenger side of **VASQUEZ** work truck to pay for the methamphetamine. At the end of the meeting, CS2 thanked **VASQUEZ** and stated that he/she left "three" a reference to $3,000, the agreed upon price for the two pounds of methamphetamine. **VASQUEZ** agreed. **VASQUEZ** told CS2, "call me when you are ready again." Their meeting then concluded.

39. CS2 was kept under constant surveillance after this meeting and subsequently met with controlling agents. The two pounds of methamphetamine was seized as evidence and subsequently submitted to the DEA Western Regional Laboratory, analyzed, and returned positive for methamphetamine.

40. After the transaction, surveillance observed **VASQUEZ** return to 1261 S. Marion St, Tulare, CA in his work truck. Based on this information, I believe that **VASQUEZ** had transported methamphetamine from **VASQUEZ**'s residence to CS2 in his work truck and then returned to his

residence with the government funds used to purchase the methamphetamine.

## G. VASQUEZ Distributes Methamphetamine to Co-conspirators

### 1. Intercepted Communications with VASQUEZ Arranging a Methamphetamine Transaction

41. As described above, Wire Intercept 1:25-sw-0247-JLT, which included the interception of Target Telephone 1 used by **VASQUEZ**, was authorized on November 24, 2025. Beginning November 30, 2025, a series of drug related communications began to be intercepted between **VASQUEZ** using Target Telephone 1 and an individual subsequently identified as Co-conspirator 2 using phone number 805-440-4543. The intercepted communications indicated that Co-conspirator 2 was a methamphetamine customer supplied by **VASQUEZ**.

42. For example, on December 5, 2026, at approximately 10:21 PM, a phone call was intercepted from **VASQUEZ** using Target Telephone 1 to Co-conspirator 2 using phone number 805-440-4543. This phone call occurred in English and the following is a partial transcript of this phone call.

| | |
|---|---|
| **VASQUEZ** | I got five (5) of them. |
| CO-CONSPIRATOR 2 | I don't have that much money. |
| **VASQUEZ** | I swear I got five (5) of them. |
| CO-CONSPIRATOR 2 | Okay, well, I believe you, but I don't have that much money. No! We're doing what you said the other day. I'll call you right back. |
| **VASQUEZ** | What's that? Better tell me now. |
| CO-CONSPIRATOR 2 | Go back in your memory bank, and remember. |
| **VASQUEZ** | I'll go back asleep right now. |
| CO-CONSPIRATOR 2 | Remember you told me to bring you seven (7)? |
| **VASQUEZ** | Are you going to get half? |
| CO-CONSPIRATOR 2 | I have a little more than that actually. I need to count. |
| | [Voices overlap] |
| **VASQUEZ** | If you give me seven (7), I'm going to give you half of one. |

| | |
|---|---|
| CO-CONSPIRATOR 2 | Oh, you fucker! You told me you'd give me a whole one. I ain't driving over there for half. |

43. During this portion of the phone call, **VASQUEZ** stated he had a quantity of "five", which I believe is a reference five pounds of methamphetamine. Co-conspirator 2 responded that she did not have enough "money" to purchase that much methamphetamine. **VASQUEZ** and Co-conspirator 2 then argued about the amount of money Co-conspirator 2 had with Co-conspirator 2 state she had "seven", which I believe is a reference to $700. **VASQUEZ** responded that he would provide a "half of one" for $700. This price is consistent with a half pound of methamphetamine for $700. Co-conspirator 2 responded that she wanted a "whole one", which I believe is one pound of methamphetamine", stating she would not drive "over there for half."

**2. VASQUEZ Distributes Methamphetamine to Co-conspirators on December 6, 2025**

44. On December 6, 2025, additional communications were intercepted between **VASQUEZ** and Co-conspirator 2 confirming Co-conspirator 2 was traveling to **VASQUEZ's** location to complete a methamphetamine transaction. For example, at approximately 11:11 AM, a phone call was intercepted to **VASQUEZ** using Target Telephone 1 from Co-conspirator 2 using phone number 805-440-4543. Initially during this phone call, Co-conspirator 2 informed **VASQUEZ**, "I'm on my way." Later during the phone call, **VASQUEZ** stated, "Tell me what you are getting." Co-conspirator 2 responded, "What do I always get?" **VASQUEZ** then replied, "uh, okay, fifteen (15)." As described above, $1,500 is the price which **VASQUEZ** was selling pound quantities of methamphetamine for. Based on this information, I believed that Co-conspirator 2 would be meeting **VASQUEZ** to obtain a pound of methamphetamine.

45. In anticipation of this transaction, surveillance was established at **VASQUEZ**' residence of 1261 S. Marion St, Tulare, CA. At approximately 1:58 PM, Co-conspirator 2 and Co-conspirator 3 arrived and met with **VASQUEZ** at 1261 S. Marion St, Tulare, CA. After approximately one hour, both departed in the same vehicle followed by surveillance.

46. Based on the above intercepted communications and surveillance, I believed that Co-

conspirator 2 and Co-conspirator 3 had obtained methamphetamine from **VASQUEZ** at 1261 S. Marion St, Tulare, CA and coordination was conducted with a marked Tulare County Sheriff's Office (TCSO) unit to conduct a stop on them. This stop occurred in the area of Ave 232 and Road 56, Tulare, CA. During the stop, Co-conspirator 2 and Co-conspirator 3 were contacted and identified. During the stop, their vehicle was searched resulting in the seizure of approximately one pound of methamphetamine from Co-conspirator 2's purse and approximately two ounces of methamphetamine[7] located in a backpack in the trunk of the vehicle. A cell phone was located in Co-conspirator 2's possession and was confirmed to be phone number 805-440-4543 during a controlled phone call to the device[8].

47. Based on this information, I believe that **VASQUEZ** had supplied the methamphetamine seized during the stop of Co-conspirator 2 and Co-conspirator 3 during their prior meeting at his (**VASQUEZ**'s) residence.

### H. <u>VASQUEZ Distributes Methamphetamine to Co-conspirators</u>

#### 1. Intercepted Communications and VASQUEZ Distributes Methamphetamine to Co-conspirators on December 14, 2025

48. On December 14, 2025, at approximately 8:17 AM, a phone call was intercepted to **VASQUEZ** using Target Telephone 1 from Co-conspirator 4 using phone number 559-351-4118. During this phone call, Co-conspirator 4 stated that he would be coming to **VASQUEZ**'s location but was trying to get "money" together. **VASQUEZ** asked if Co-conspirator 4 wanted the "whole thing." Co-conspirator 4 responded "half." **VASQUEZ** then quoted a price of $750. Co-conspirator 4 and **VASQUEZ** then argued over the price with **VASQUEZ** finally agreeing to supply the half for $700. I know, based on my training and experience, that $700 is consistent with the price **VASQUEZ** was transacting a half pound of methamphetamine for. Therefore, I believe that Co-conspirator 4 was arranging to purchase methamphetamine from **VASQUEZ**.

---

[7] The methamphetamine seized from co-conspirator 2 and co-conspirator 3was submitted to the DEA Western Regional Laboratory, analyzed, and determined to be methamphetamine.

[8] A controlled phone call is a law enforcement technique used to determine if a cell phone is associated with a specific phone number. It is done when the cell phone is in police custody and the specific phone number is called from a law enforcement phone. If the cell phone in police custody is activated upon the law enforcement phone initiating contact, and/or displays the law enforcement phone number on the face screen, the specific phone number is confirmed as associated with the seized cell phone.

49. Based on this intercepted communication and the anticipated methamphetamine transaction, surveillance was initiated at **VASQUEZ**'s residence of 1261 S. Marion St, Tulare, CA via a remote-controlled video surveillance camera. At approximately 10:33 PM, a BMW sedan with CA license plate #6XXL070 arrived and parked in front of 1261 S. Marion St, Tulare, CA. This vehicle is registered to Co-conspirator 4 with a listed address of 1809 N. 10th Ave, Hanford, CA. At approximately 11:12 PM, this vehicle departed 1261 S. Marion St, Tulare, CA. Based on this observation, I concluded that Co-conspirator 4 had obtained the negotiated half pound of methamphetamine from **VASQUEZ** and a vehicle stop was arranged utilizing a TCSO marked patrol unit.

50. Surveillance followed Co-conspirator 4 from 1261 S. Marion St, Tulare, CA to the area of Mooney Grove Park on Mooney Blvd, Visalia, CA. At this location, a stop was conducted on Co-conspirator 4 and, while contacted, Co-conspirator 4 was determined to be in possession of approximately a half pound of methamphetamine.[9] A cell phone was also located in Co-conspirator 4's possession which was confirmed to be 559-351-4118 during a controlled phone call to the device.

51. Based on the above information, I believe that Co-conspirator 4 had obtained the half pound of methamphetamine from **VASQUEZ** at 1261 S. Marion St, Tulare, CA prior to being stopped and the drug seized.

## I. <u>VASQUEZ and MEDRANO Distribute Methamphetamine</u>

### 1. Recorded and Intercepted Communications with VASQUEZ and MEDRANO Arranging a Methamphetamine Transaction

52. On November 26, 2025, CS2 was directed by controlling agents to initiate recorded communications with **VASQUEZ** in order to arrange the third purchase of two pounds of methamphetamine. On the same date, Wire Intercept 1:25-SW-0247-JLT was active on phone number 559-736-8111 (Target Telephone 1), **VASQUEZ**' phone number. The following is a summary of some of the intercepted communications between **VASQUEZ** and CS2, as well as between **VASQUEZ** and other Co-conspirators, leading to the controlled purchase of two pounds of suspected methamphetamine, which ultimately occurred on November 28, 2025.

---

[9] The methamphetamine seized from co-conspirator 4 was submitted to the DEA Western Regional Laboratory, analyzed, and determined to be methamphetamine.

53. On November 26, 2025, beginning at approximately 7:11 PM, the following text message exchange occurred between **VASQUEZ** using Target Telephone 1 and CS2.

- CS2: "Whats up bro hoW are you."
- CS2: "Call me when ou can im going to be passing through friday hopefully if not for sure monday needed something."
- **VASQUEZ**: "Whoa this."
- **VASQUEZ**: "now I iknow who it is.\nGive me a four hour window when you're coming."

54. This last text message between **VASQUEZ** and CS2 occurred at approximately 7:34 PM. By the time of this text message exchange, **VASQUEZ** and CS2 were already in an established methamphetamine source of supply/customer relationship having completed two prior methamphetamine transactions. I know, based on my training and experience, that, after a drug transaction relationship is established, the communications needed to arrange a pending transaction can be increasingly vague, sometimes discussing only when the transaction is to occur. This is because the type, quantity and price of a drug to be transacted was established through prior transactions. In the above communications, CS2 only needed to inform **VASQUEZ** that the transaction was going to be "Friday", a reference to November 28, 2025, and that he/she needed something. In turn, and after **VASQUEZ** recognized who CS2 was, asked for a "four hour window" for when CS2 was to arrive to conduct the transaction.

55. At approximately 8:15 PM, a phone call was attempted from **VASQUEZ** using Target Telephone 1 to **MEDRANO** using Target Telephone 4[10]. This phone call was not answered and no voice

[10] **MEDRANO** was initially associated with Target Telephone 4 because the phone is subscribed to him. During Wire Intercept 1:25-SW-0247-JLT, multiple communications were intercepted between VASQUEZ and the user of Target Telephone 4 confirming **MEDRANO**'s use of this phone. For example, during intercepted communications, VASQUEZ consistently referred to the user of Target Telephone 4 as "Viejo," **MEDRANO**'s known alias. Furthermore, multiple communications were intercepted regarding construction and repairs VASQUEZ was performing at **MEDRANO**'s residence of 1780 Riesling St., Tulare, CA. Via a remote-controlled video surveillance camera in the area of 1780 Riesling St., Tulare, CA, VASQUEZ was consistently observed at this residence working on a building in the back yard of the residence as well as doing other repairs. At the same time, **MEDRANO** and **MEDRANO**'s vehicles were consistently observed at this residence confirming his (**MEDRANO**'s) residency there. Lastly, on December 6, 2025, the Honorable Barbara A. McAuliffe, US Magistrate Judge for the Eastern District of CA, signed Search Warrant 1:25-sw-00251-BAM authorizing the collection of precise location information from phones to include Target Telephone 4 used by **MEDRANO**. Precise location information was obtained from December 8, 2025 to January 7, 2026. The precision of location results were consistently in the 100s to 1,000s of meters. However, precise location information for Target Telephone 4 consistently placed the phone in the area of 1780 Riesling St., Tulare, CA during nighttime and early morning hours further confirming **MEDRANO**'s use of

message was left.

56. At approximately 8:18 PM, and with no intercepted communications in-between the attempted phone call with **MEDRANO**, a phone call was intercepted from **VASQUEZ** using Target Telephone 1 to Co-conspirator 1 using phone number 559-870-9062. The following is a transcript of this phone call.

| **NAME** | **TRANSCRIPTION** |
|---|---|
| | **[Beginning of call]** |
| CO-CONSPIRATOR 1 | Hello. |
| **VASQUEZ** | [U/I]. I told you; I need to go to Viejo's. [Background: voices] |
| CO-CONSPIRATOR 1 | Okay, I'm, I'm at Walmart! |
| **VASQUEZ** | Why are you at Walmart all the time? You've been over there an hour. I need to go and make sure he doesn't go to sleep. I need one of those [U/I]. Maybe you could stop by there and tell him or call me… |
| | [Voices overlap] |
| CO-CONSPIRATOR 1 | Okay, see if it's okay |
| | [Voices overlap] |
| **VASQUEZ** | Wait, if you're there… cause he won't answer his phone, so if you're there… go see if it's… we need to go get one. |
| CO-CONSPIRATOR 1 | Okay, I'll call you. I'm paying right now. |
| **VASQUEZ** | I need another one. But are you there or at Becca's [PH] house? |
| CO-CONSPIRATOR 1 | I'm at fucking Walmart, I'm telling you! [Static] [U/I]. |
| **VASQUEZ** | You've been gone three (3) hours. |
| CO-CONSPIRATOR 1 | Well… well, I was trying to find the, the toilet paper you mom wants. |
| **VASQUEZ** | Yeah, okay. Good one. [U/I]. |
| CO-CONSPIRATOR 1 | [U/I]. |
| **VASQUEZ** | Go see, please. |
| CO-CONSPIRATOR 1 | Okay, I'm going now. Bye. |
| | **[End of call]** |

---

this phone. Based on this information, I believe that **MEDRANO** is the user of Target Telephone 4.

57. During this phone call, **VASQUEZ** stated that he needed to go to "Viejo's." Viejo was identified during multiple prior investigations as a nickname used by **MEDRANO**. During this investigation, **MEDRANO**'s association with the nickname "Viejo" was continually confirmed during intercepted communications which usually took the theme of **VASQUEZ** indicating he was at "Viejo's" residence and concurrently observed by surveillance at 1780 Riesling St, Tulare, CA, **MEDRANO**'s residence. During this phone call, **VASQUEZ** informed Co-conspirator 1, "I need one of those." **VASQUEZ** then made a reference to the prior missed phone call with **MEDRANO** over Target Telephone 4 minutes before this phone call by stating, "he won't answer his phone" and again stated, "we need to go get one." Based on these statements, I believe that **VASQUEZ** was informing Co-conspirator 1 that he (**VASQUEZ**) needed to see **MEDRANO** for a quantity of "one." Toward the end of the conversation, **VASQUEZ** again stated that he needed "one" and argued with **VASQUEZ** for taking too long at Walmart. As will be described in more detail in the following intercepted communications, I believe that the term "one" used by **VASQUEZ** was a reference to one pound of methamphetamine **VASQUEZ** was attempting to obtain from **MEDRANO**.

58. Additional communications were intercepted between **VASQUEZ** and Co-conspirator 1 as **VASQUEZ** directed Co-conspirator 1 to obtain the methamphetamine from **MEDRANO**. For example, at approximately 8:28 PM, a phone call was intercepted to **VASQUEZ** using phone number 559-736-8111 from Co-conspirator 1 using phone number 559-870-9062. The following is a transcript of this phone call.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| **VASQUEZ** | Yeah. |
| CO-CONSPIRATOR 1 | Hey. |
| **VASQUEZ** | What? |
| CO-CONSPIRATOR 1 | I think his home and he's coming out right now. [U/I] |
| **VASQUEZ** | Yeah. Tell him [U/I] go get another one, but he only went because you were there, and he wasn't at. |
| | [Voices overlap] |

| | |
|---|---|
| CO-CONSPIRATOR 1 | [U/I] He's coming. Alright. I'll call you right back. |
| **VASQUEZ** | Bye. |
| | **[End of call]** |

59. During this intercepted communication, Co-conspirator 1 referenced **MEDRANO** being at home stating, "I think his home and he's coming out right now." **VASQUEZ** reminded Co-conspirator 1 to "get another one", which I believe was a pound of methamphetamine **VASQUEZ** was to receive from **MEDRANO**.

60. At approximately 8:31 PM, the following was observed by surveillance via a remote-controlled video surveillance camera at 1780 Riesling St, Tulare, CA. A white Nissan Altima with CA license plate #8AJJ743 arrived and parked on the west side of Riesling St., across the street from 1780 Riesling St, Tulare, CA. This vehicle is registered to Fidel **VASQUEZ** with a listed address of 1261 S. Marion St., Tulare, CA, but has previously been observed by surveillance being operated by Co-conspirator 1. The vehicle was occupied by two individuals with Co-conspirator 1 being the driver of the vehicle. Co-conspirator 1 exited the Nissan Altima and walked to the front door of 1780 Riesling St, Tulare, CA. At approximately 8:32 PM, Co-conspirator 1 departed the front door of 1780 Riesling St, Tulare, CA, returned to the Nissan Altima and departed. These observations were consistent with Co-conspirator 1 meeting with **MEDRANO** at 1780 Riesling St, Tulare, CA, to obtain the pound of methamphetamine ordered by **VASQUEZ** during the prior intercepted communications.

61. At approximately 8:36 PM, minutes after **VASQUEZ** had been observed departing 1780 Riesling St, Tulare, CA, a phone call was intercepted to **VASQUEZ** using Target Telephone 1 from **MEDRANO** using Target Telephone 4. The following is a transcript of this phone call which occurred in the English language.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| **VASQUEZ** | Hello [U/I] Is… |
| **MEDRANO** | He should be getting there. |
| **VASQUEZ** | Okay. I'll see you right…[Glitch] I'll see you in a few minutes. |

| | |
|---|---|
| | [Voices overlap] |
| **MEDRANO** | He should be getting there. |
| **VASQUEZ** | Okay. I'll see you in a few minutes. |
| | **[End of call]** |

62. Based on the timing of this phone call, I believe that **MEDRANO** was informing **VASQUEZ** that Co-conspirator 1 had departed and would be "getting there" or arriving to **VASQUEZ**'s location with the methamphetamine. **VASQUEZ** responded by twice informing **MEDRANO**, "I'll see you in a few minutes." As previously described, **VASQUEZ**'s plan was to obtain a pound of methamphetamine from **MEDRANO** and then "offer him back the money real quick." I believe that this was why **VASQUEZ** was informing **MEDRANO** that he (**VASQUEZ**) would see him (**MEDRANO**) in a few minutes.

### 2. VASQUEZ & Co-conspirators Distributed Methamphetamine on November 28, 2025 During a Controlled Purchase

63. On November 28, 2025, a controlled purchase of two pounds of methamphetamine was conducted from **VASQUEZ** by CS2 at the Flying J Truck Stop located at 979 E. Paige Ave, Tulare, CA. Prior to the controlled purchase, several additional recorded communications occurred between **VASQUEZ** using Target Telephone 1 and CS2 arranging the final amount of methamphetamine, confirmed to be two pounds, as well as the time and location to meet. However, no additional pertinent communications were intercepted between **VASQUEZ**, Co-conspirator 1, or **MEDRANO** in furtherance of the transaction with CS2.

64. The controlled purchase on November 28, 2026, transpired as follows: **VASQUEZ** was observed via the remote-controlled video surveillance camera working at **MEDRANO**'s residence of 1780 Riesling St, Tulare, CA. At approximately 3:44 PM, **VASQUEZ** departed 1780 Riesling St., Tulare St, Tulare, CA, carrying a pink backpack while driving a white GMC work truck with CA license plate #40124G4. This vehicle is registered to **MEDRANO** with a listed address of 1780 Riesling St, Tulare, CA. While communications were not specifically intercepted regarding the contents of the pink backpack, I believe it likely contained a portion of the methamphetamine ordered by CS2.

65. However, I do not believe that the pink backpack contained the entire amount of methamphetamine needed to complete the transaction with CS2 based on the following series of events which occurred after **VASQUEZ** departed **MEDRANO**'s residence of 1780 Riesling St, Tulare, CA. From **MEDRANO**'s residence, surveillance followed **VASQUEZ** to his (**VASQUEZ**'s) residence of 1261 S. Marion St., Tulare, CA. At approximately 3:47 PM, and while in route to his residence, a phone call was intercepted between **VASQUEZ** using Target Telephone 1 and Co-conspirator 5 using phone number 559-356-6732. The following is a transcript of this phone call which occurred in the English language.

| **NAME** | **TRANSCRIPTION** |
|---|---|
| | **[Beginning of call] [Call already in progress]** |
| **VASQUEZ** | …in that whisk… wicker basket, that brown wicker basket. The… you know the…the three (3)… |
| | [Voices overlap] |
| CO-CONSPIRATOR 5 | Yes. |
| | [Voices overlap] |
| **VASQUEZ** | … drawer wicker basket? Second drawer, pull that bag out… [Background: voices] and put it in a, in a, you know, like in a FoodsCo. Bag or whatever… |
| CO-CONSPIRATOR 5 | Yeah. |
| | [Voices overlap] |
| **VASQUEZ** | …bring it out [U/I]. I'll be in Viejo's white truck. He's… |
| | [Voices overlap] |
| CO-CONSPIRATOR 5 | Okay. |
| | [Voices overlap] |
| **VASQUEZ** | …not with me, I came by myself. |
| CO-CONSPIRATOR 5 | All right. |
| **VASQUEZ** | Cuz the guy's already here… over there. |
| CO-CONSPIRATOR 5 | All right, bye. |
| **VASQUEZ** | Bye. |
| | **[End of call]** |

66. During this intercepted communication, **VASQUEZ** instructed Co-conspirator 5 to retrieve a bag for him, describing specifically where it was located. **VASQUEZ** described himself as being in "Viejo's white truck" a reference to **MEDRANO**'s GMC work truck and stating he (**VASQUEZ**) was alone. Referencing CS2, **VASQUEZ** stated, "the guys already here" and **VASQUEZ** would be in route to meet CS2 to conduct the methamphetamine transaction.

67. At approximately 3:52 PM, surveillance observed the following from the remote controlled video surveillance camera in the area of 1261 S. Marion St., Tulare, CA. **VASQUEZ** arrived at the residence and parked the GMC work truck on the street without exiting. Co-conspirator 5 walked from the direction of 1261 S. Marion St., Tulare, CA with a plastic grocery bag which she placed through the window of the GMC work truck. Afterward, **VASQUEZ** departed in this vehicle in route the Flying J Truck Stop to meet CS2.

68. Based on the above-described intercepted communication and surveillance observations, I believe that the bag which Co-conspirator 5 retrieved from 1261 S. Marion St., Tulare, CA and placed in the GMC work truck was at least a portion of the methamphetamine which **VASQUEZ** intended to transact with CS2.

69. After departing 1261 S. Marion St., Tulare, CA, **VASQUEZ** next arrived at the Flying J Truck Stop located at 979 E. Paige Ave, Tulare, CA, the agreed upon meeting location to conduct the methamphetamine transaction. At that location, CS2 conducted an audio/video recorded meeting with **VASQUEZ** at the GMC work truck. During this meeting, **VASQUEZ** supplied CS2 with two pounds of methamphetamine in exchange for $3,000 in government funds.

70. After the controlled purchase, controlling agents met with CS2 and seized the purchased methamphetamine as evidence. The methamphetamine was submitted to the DEA Western Regional Laboratory, analyzed, and determined to be methamphetamine. Fingerprint analysis was conducted on the methamphetamine packaging as well as the plastic bag which the methamphetamine was contained in. Co-conspirator 5's fingerprints were located on the packaging while **VASQUEZ**'s and **MEDRANO**'s fingerprints were excluded.

**J. <u>MEDRANO Distributes Fentanyl to Hector AVELAR</u>**

1. **Surveillance and Arrest of Hector AVELAR on November 30, 2025**

71. During this investigation, heavy vehicle and foot traffic has been observed at 1780 Riesling St, Tulare, CA. Various individuals have been observed either conducting quick meetings and/or exchanges with **MEDRANO**[11] at this location and then departing. I know, based on my training and experience, that this activity is consistent with drug trafficking. This conclusion is further bolstered by multiple stops and searches conducted on suspects who have departed 1780 Riesling St, Tulare, CA after such activity was observed. One such example of this activity occurred on November 30, 2025. On that date, surveillance was being conducted at 1780 Riesling St, Tulare, CA via a remote-controlled video surveillance camera. At approximately 1:55 PM, an individual subsequently identified as Hector **AVELAR** arrived at 1780 Riesling St, Tulare, CA as the back passenger of a Chevrolet Camero which was occupied by two additional individuals. The following interaction was then observed between **MEDRANO** and **AVELAR** at 1780 Riesling St, Tulare, CA. **AVELAR** initially walked toward the front of the residence and then to the side yard. **AVELAR** met with **MEDRANO** near the side pedestrian entrance to the garage. **AVELAR** entered the side entrance to the garage as **MEDRANO** walked towards the back yard of the residence. **AVELAR** then walked from the side entrance of the garage back to the Chevrolet Camero. **MEDRANO** opened the garage door and waited by the garage door for **AVELAR**'s return. **AVELAR** again went to the passenger side of the waiting Chevrolet Camero and obtained a black backpack. **AVELAR** carried the backpack in one hand, dangling by his side, an indication the backpack was empty, as he returned to the garage of the residence. **AVELAR** entered through the open garage door where **MEDRANO** had just previously entered as well. The garage door was then closed for several minutes.

72. At approximately 2:09 PM, **AVELAR** exited from the side yard with the black backpack which was now slung over his shoulder. **AVELAR** walked to the Chevrolet Camero, entered the back seat of the vehicle with the backpack, and departed followed by surveillance. Based on the above

[11] During this investigation, **MEDRANO**'s CA DMV photograph was obtained and disseminated to the investigative team. This identification was done by comparing **MEDRANO**'s DMV photo to the surveillance video, resulting in the positive identification.

observations, a vehicle stop was coordinated on the Chevrolet Camero which was conducted by a TCSO marked patrol unit southbound Highway 99 near Tipton, CA. During the stop, **AVELAR**'s identification was confirmed and the backpack he was previously observed carrying from 1780 Riesling St, Tulare, CA was located in the trunk of the vehicle. Inside the backpack, approximately one kilogram of fentanyl[12] was located and seized.

73. Based on the above described surveillance and seizure, I believe that **AVELAR** had obtained the kilogram of fentanyl from **MEDRANO** during their meeting at 1780 Riesling St, Tulare, CA.

### K. MEDRANO Distributes Methamphetamine to Arturo LEON

#### 1. Intercepted Communications, Surveillance and Arrest of Arturo LEON on December 2, 2025

74. On December 2, 2025, at approximately 6:19 PM, a phone call was intercepted to **VASQUEZ** using Target Telephone 1 from **MEDRANO** using Target Telephone 4. The following is a transcript of this phone call which occurred in English.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| **VASQUEZ** | Hello |
| **MEDRANO** | Come to the house.. |
| **VASQUEZ** | Huh? |
| **MEDRANO** | Come to the house.. |
| **VASQUEZ** | Oh shit…[U/I]…Alright, by. |
| | **[End of call]** |

75. At approximately 6:20 PM and immediately after the above intercepted communication, the following phone call was intercepted from **VASQUEZ** using Target Telephone 1 to **MEDRANO** using Target Telephone 4. The following is a transcript of this phone call which occurred in the English language.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| **MEDRANO** | Hello. |
| **VASQUEZ** | Do I have time to go to Kingsburg first? |

[12] The fentanyl was submitted to the DEA Western Regional Lab, analyzed, and confirmed to be fentanyl.

| | |
|---|---|
| **MEDRANO** | No. |
| **VASQUEZ** | Go to your house first. Okay. I'll be right there. |
| | **[End of call]** |

76. During the initial phone call, **MEDRANO** directed **VASQUEZ** to his (**MEDRANO**'s) residence. During the second phone call, **VASQUEZ** asked if he could go to Kingsburg first and, after **MEDRANO** stated "no," **VASQUEZ** stated he would go to **MEDRANO**'s house. During prior intercepted communications, **VASQUEZ** had arranged to travel to Kingsburg with UM4750, the user of phone number 559-467-4750. This is the reason why **VASQUEZ** asked **MEDRANO** if he could travel to Kingsburg first during this intercepted communication.

77. At approximately 6:25 PM and sequentially after the communications with **MEDRANO**, a phone call was intercepted from **VASQUEZ** using Target Telephone 1 to UM4750 using phone number 559-467-4750. The following is a transcript of this phone call which occurred in English.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| | [Call in progress] |
| UM4750 | [Background: voices throughout the call] [Aside: Yeah.] |
| **VASQUEZ** | Um, Thomas. |
| UM4750 | Hello. |
| **VASQUEZ** | Thomas. |
| UM4750 | Yeah. |
| **VASQUEZ** | Can you go to my house? |
| UM4750 | I guess, yeah. |
| **VASQUEZ** | [U/I] I was. I was just fucking leaving and that mother fucker called. [U/I]. |
| UM4750 | What happened? |
| **VASQUEZ** | I was leaving and that mother fucker… I just left his fucking house. He calls me up to go pick up something I was waiting for… |
| | [Voices overlap] |
| UM4750 | Hold on. Let me see if my fucking volume's all… yeah. Brittney [PH] turned down my volume. I couldn't hear you for saving my life. What now? |
| | [Voices overlap] |
| **VASQUEZ** | No, I [U/I]. I just left his fucking house. I waited all afternoon for you know what. Waiting for it. And we just get home right now. [U/I] getting ready to go and he calls me up, and says, "Come pick it up right now." [Brief pause] You know what I'm talking about, right? |
| UM4750 | Yeah, clear. |

| | |
|---|---|
| **VASQUEZ** | Come on over to pick and pick it up real quick. It's at my house. |
| UM4750 | All right. Bye. |
| | **[End of call]** |

78. During this phone call, **VASQUEZ** provided clarity as to why he (**VASQUEZ**) needed to travel to **MEDRANO**'s house prior to leaving for Kingsburg with UM4750. Referring to **MEDRANO**, **VASQUEZ** stated, "that mother fucker called." **VASQUEZ** stated, "I just left his fucking house. He calls me up to go pick up something I was waiting for…" Later in the conversation, **VASQUEZ** stated, "I waited all afternoon for you know what. Waiting for it," and was then directed by **MEDRANO** to "Come pick it up right now." I know, based on my training and experience, that drug traffickers often use coded or vague language to refer to controlled substances. Based on **MEDRANO** being one of **VASQUEZ**'s methamphetamine sources of supply, I believe that **VASQUEZ** was using the term "it", during his (**VASQUEZ**'s) communication with UM4750, to refer to methamphetamine he (**VASQUEZ**) was supposed to pick up from **MEDRANO**'s residence. Therefore, I believe that **MEDRANO** directing **VASQUEZ** to his (**MEDRANO**'s) residence during the prior intercepted communications was for the purpose of obtaining methamphetamine.

79. Based on this intercepted communication, surveillance was focused on **MEDRANO**'s residence of 1780 Riesling St, Tulare, CA via a remote-controlled video surveillance camera. At approximately 6:22 PM, surveillance observed **MEDRANO** arrived in his Jeep Wrangler with CA license plate #9DZA196 via the remote-controlled video surveillance camera. This vehicle is registered to Xavier **MEDRANO** with a listed address of 1780 Riesling St, Tulare, CA. His arrival occurred approximately two minutes after the intercepted communications during which **MEDRANO** utilized Target Telephone 4 to direct **VASQUEZ** to his (**MEDRANO**'s) residence. Within minutes upon arrival, two individuals took items from the Jeep Wrangler and walked south out of view of the remote-controlled video surveillance camera. During this investigation, **MEDRANO** has also been associated with 1710 Riesling St., Tulare, CA which would have been in the direction of where these two individuals walked.

80. At approximately 6:36 PM, **VASQUEZ** arrived and met with **MEDRANO** near the Jeep Wrangler for approximately six minutes before departing. **VASQUEZ** had arrived and departed in his

(**VASQUEZ**'s) white Nissan sedan.

81. Lastly, at approximately 6:46 PM, an individual subsequently identified as Arturo **LEON** (A. **LEON**) walked from 1780 Riesling St, Tulare, CA and entered a silver Honda Accord with CA license plate #8WID232 which was parked across the street from the residence. This vehicle is registered to Arturo **LEON** with a listed address of 3310 South Cedar St, Visalia, CA. A. **LEON** was carrying a backpack from **MEDRANO**'s residence to this vehicle.

82. Based on the intercepted communications, I believe that **MEDRANO** had arrived at 1780 Riesling St, Tulare, CA in the Jeep Wrangler with a drug shipment. I know, based on my training and experience, that drug shipments are often quickly distributed to lower members of the DTO for the purpose of further distribution throughout the organization. I believe that individuals, to include **VASQUEZ**, arriving within minutes of **MEDRANO**'s arrival, meeting with **MEDRANO** by the Jeep Wrangler, and then quickly departing, is consistent with distribution of a drug shipment. The observation of **VASQUEZ**'s arrival confirmed he (**VASQUEZ**) had followed **MEDRANO**'s direction and was present to receive a portion of the drug shipment which he (**VASQUEZ**) had been "waiting" for. I also believed that A. **LEON** departing 1780 Riesling Ave, Tulare, CA minutes after **MEDRANO** arrived indicated he was leaving with portions of the drug shipment.

83. Based on the above intercepted communications and observations from the remote-controlled video surveillance camera, surveillance was initiated on A. **LEON** after he departed 1780 Riesling Ave, Tulare, CA with the backpack. A vehicle stop was arranged on **LEON** utilizing a marked VPD patrol unit. During the stop, A. **LEON** was identified as the driver and sole occupant of the vehicle. During a subsequent search of the vehicle, two bindles of suspected cocaine and a digital scale were located and A. **LEON** was taken into custody. However, the backpack which surveillance had observed A. **LEON** depart 1780 Riesling Ave, Tulare, CA with was not located during the vehicle search. Surveillance units retraced the route A. **LEON** traveled immediately prior to the vehicle stop and located the backpack discarded on the side of the road. The backpack was searched and found to contain approximately four pounds of methamphetamine[13]. Based on the above information, I believe that the

[13] The methamphetamine was submitted to the DEA Western Regional Laboratory, analyzed, and confirmed to be methamphetamine.

four pounds of methamphetamine had originated from 1780 Riesling Ave, Tulare, CA and was supplied by **MEDRANO**.

**L. UM9106 & Gustavo PLASCENCIA Distribute Methamphetamine**

**1. Intercepted Communications, Surveillance and Delivery of Methamphetamine to a Co-conspirator**

84. During the wire intercepts conducted during this investigation, **UM9106** has been identified as the user of multiple phones to include 559-619-1576 (Target Telephone 2), 559-870-9106 (Target Telephone 3), and 559-991-5368 (Target Telephone 6) based on the following information. After initially being identified as the user of Target Telephone 2[14], phone numbers subsequently used by **UM9106** (Target Telephone 3 and Target Telephone 6) were initially identified through a common call analysis[15]. Upon identification and subsequent Wire Intercepts 1:26-SW-0018-JLT and 1:26-SW-

[14] During this investigation, **UM9106** has not been conclusively identified from a government issued ID. However, investigators and surveillance units are familiar with **UM9106**'s appearance based on direct observation as well as surveillance photos and video taken of him during this investigation. Surveillance initially observed **UM9106** based on precise location information obtained from Target Telephone 2 via Search Warrant 1:25-sw-00199-BAM which was authorized on August 28, 2025 by the Honorable Barbara A. McAuliffe, US Magistrate Judge for the Eastern District of CA. On September 8, 2025, precise location information from Target Telephone 2 placed **UM9106** at the Tachi Palace Casino in Lemoore, CA. Surveillance was established on **UM9106** at that location and a vehicle stop was arranged upon returning to Tulare County for the purpose of identification. During this vehicle stop, **UM9106** falsely identified himself as Luis PLASCENCIA by presenting a valid CA drivers license belonging to Luis PLASCENCIA. **UM9106** repeated this false identification on February 24, 2026 during a contact with the Tulare Police Department which was captured on body worn camera. Over the course of this investigation, information has been obtained indicating the actual Luis PLASCENCIA was in Mexico while **UM9106** remained in the United States during this investigation. Based on this information, the user of Target Telephone 2, 3, and 6 is referred to as Unidentified Male 9106 or **UM9106** and can be recognized by law enforcement, but is not Luis PLASCENCIA. However, it is believed that **UM9106** has assumed Luis PLASCENCIA's identity and is representing himself as such.

[15] I know, based on my training, experience, and conversation with other law enforcement officers that drug traffickers will often discontinue use of their cellphone(s) in an attempt to thwart efforts by law enforcement to either intercept their communications or track their location. I further know that drug traffickers need to communicate with co-conspirators via cellphone(s) in order to continue their criminal enterprise. Therefore, I know that drug traffickers will obtain replacement cellphone(s), or begin to use preexisting cellphone(s), around the same date as they discontinue the use of their previous cellphone(s) to contact criminal associates. This is commonly known as "cycling" through cellphones. I know, based on my training, experience, and conversation with other law enforcement officers, that drug trafficker's new cellphone number can be identified through a process known as common call analysis. During common call analysis, a new cellphone number is identified by comparing frequently called phone numbers from the drug trafficker's predecessor cellphone(s) and determining which new phone number is being contacted by these common phone numbers after the use of the predecessor cellphone was discontinued or diminished. The new Target Telephone will have a similar calling pattern to their predecessor phone(s). That is, many of the same phone numbers dialed in common and similar dialed frequencies, as the discontinued predecessor cellphone(s). Also, it is common for the drug trafficker's new Target Telephone to be activated on or around the date as the discontinuation of the drug trafficker's predecessor cellphone(s).

00108-JLT being initiated on Target Telephones 3 and 6, a voice comparison was conducted by agents and monitors assigned to this investigation which led to the conclusion that both phones were used by the same individual who initial used Target Telephone 2. Furthermore, court ordered precise location information obtained during the wire intercepts on all three target telephones consistently placed **UM9106** in the area of his residence of 1116 W. Porter Ave, Visalia, CA during early morning and night time hours. During surveillance conducted based on intercepted communications, and/or precise location information being obtained from all three target telephones, **UM9106** was consistently observed moving in concert with the devices. Lastly, **UM9106** was consistently referred to by the alias "Bronco" during intercepted communications.

85. During Wire Intercept 1:26-SW-0018-JLT, multiple pertinent drug related communications were intercepted between **UM9106** using Target Telephone 3 and Co-conspirator 6 using phone number 559-372-5386. For example, on March 13, 2026, at approximately 2:08 PM, a phone call was intercepted to **UM9106** from Co-conspirator 6. This phone call occurred in English and the following is a transcript of this phone call.

| **NAME** | **TRANSCRIPT** |
|---|---|
| | [Beginning of call] |
| | [Background: Static] |
| **UM9106** | [U/I] |
| CO-CONSPIRATOR 6 | Any luck on that? |
| **UM9106** | Uh… Like. You know the [U/I] one. You know the [U/I] one… Uh, you want to wait, uh, for more later, or you want…? |
| CO-CONSPIRATOR 6 | Uh, it don't matter. It don't matter I guess. Because, um… um… Well, I mean I guess I have to wait for myself. I guess I'll, I guess I could get through it, but I could… I could basically give that for you though… I don't know. It's up to you. Just let me know if you're going to come right now because I have other things to do too, so… |
| **UM9106** | Yeah, like… What you need… What do you need like, uh, meth? |
| CO-CONSPIRATOR 6 | Yeah, yeah. That's fine. |
| **UM9106** | Where are you at? |

| | |
|---|---|
| CO-CONSPIRATOR 6 | At home. |
| **UM9106** | Home? |
| CO-CONSPIRATOR 6 | Yeah. |
| | [Voiced overlap] |
| **UM9106** | Okay, like, uh. Okay, like give me, uh… Before Three (3) is okay? |
| CO-CONSPIRATOR 6 | Yeah, yeah. That's fine. |
| **UM9106** | Okay. I'll be there before Three (3). |
| | [Voices overlap] |
| CO-CONSPIRATOR 6 | Okay… Okay, bye. |
| | **[End of call]** |

86. At the beginning of this phone call, **UM9106** and Co-conspirator 6 discussed conducting a transaction. **UM9106** then stated, "What do you need like, uh, meth." Although I know it is unusual for drug traffickers to use the specific name of the controlled substance to be transacted, usually opting for more coded language, this is exactly what **UM9106** did during this intercepted communication. Therefore, I knew the pending transaction with Co-conspirator 6 was for methamphetamine. Co-conspirator 6 then confirmed the controlled substance she wanted was methamphetamine by stating, "Yeah, yeah. That's fine." Towards the end of the phone call, **UM9106** and Co-conspirator 6 agreed to meet around "three", which I believed to be a reference of 3:00 PM to complete the transaction.

87. At approximately 3:03 PM, a phone call was intercepted from **UM9106** using Target Telephone 3 to Co-conspirator 6 using 559-372-5386. This phone call occurred in English and the following is a transcript of this phone call.

| **NAME** | **TRANSLATION** |
|---|---|
| | **[Beginning of call]** |
| CO-CONSPIRATOR 6 | Hello? |
| **UM9106** | Hey! |
| CO-CONSPIRATOR 6 | Yeah. |

| | |
|---|---|
| | [Voices overlap] |
| **UM9106** | Like, like my brother… He is going to go, like to you… Is that okay? |
| CO-CONSPIRATOR 6 | That's fine. Whatever. |
| **UM9106** | Okay, so, so, like he's going. He's like going in like [Stutters] Thirty (30) minutes he's going to be, like, at your house. |
| | [Voices overlap] |
| CO-CONSPIRATOR 6 | Okay, okay. Alright, bye. |
| **UM9106** | Bye. |
| | **[End of call]** |

88. During this phone call, **UM9106** stated, "Like, like my brother… He is going to go, like to you… Is that okay?" Based on this phone call, **UM9106**'s brother was anticipated to deliver the methamphetamine to Co-conspirator 6. **UM9106**'s brother has been identified as **PLASCENCIA** who also resides at 1116 W. Porter Ave, Visalia, CA. Based on this information, surveillance was focused on this address utilizing a remote-controlled video surveillance camera in anticipation of **PLASCENCIA** departing with methamphetamine to deliver to Co-conspirator 6.

89. At approximately 3:03 PM, at approximately the same time as this phone call, surveillance observed **PLASCENCIA**[16] walking back and forth from 1116 W. Porter Ave, Visalia, CA to a white Toyota SUV with CA license plate #8CWV249. **PLASCENCIA** was observed carrying a smaller bag as well as a duffle bag from the residence to this vehicle. At approximately 3:17 PM, **PLASCENCIA** was then observed departing 1116 W. Porter Ave, Visalia, CA in the Toyota SUV. Based on the prior intercepted communications, I believe **PLASCENCIA** had departed this address with the methamphetamine ordered by MARTINEZ.

90. In anticipation of the methamphetamine being transacted at 5946 W. Oak Ave, Visalia, CA, surveillance was established at that location. At approximately 3:51 PM, the Toyota SUV which **PLASCENCIA** departed in was observed parked in the driveway of this residence. Minutes later, this

[16] During this investigation, **PLASCENCIA**'s CA DMV photograph was obtained and disseminated to the investigative team. This identification was done by comparing **PLASCENCIA**'s DMV photo to the surveillance video, resulting in the positive identification.

vehicle departed from 5946 W. Oak Ave, Visalia, CA.

91. Based on these observations, I believed that **PLASCENCIA** had delivered the methamphetamine to Co-conspirator 6 as indicated during the intercepted communication with **UM9106**. Surveillance was maintained on 5946 W. Oak Ave, Visalia, CA in anticipation of the methamphetamine being transported away from the residence and further transacted.

92. At approximately 4:16 PM, a Toyota Tundra with CA license plate #6D36965 arrived at 5946 W. Oak Ave, Visalia, CA. An individual, subsequently identified as Co-conspirator 7, was observed walking toward the direction of the residence and departing minutes later. Based on the above information, a vehicle stop utilizing a marked VPD patrol unit was arranged on the Toyota Tundra. This stop was subsequently conducted in the city of Visalia. During this stop, Co-conspirator 7 was identified as the driver and sole occupant of the vehicle. Co-conspirator 7 was arrested after approximately two ounces of methamphetamine[17] was found in his possession.

93. Based on the intercepted communications, surveillance, and subsequent seizure, I believed that Co-conspirator 6 ordered methamphetamine from **UM9106**, **UM9106** arranged for his brother, **PLASCENCIA**, to deliver the methamphetamine to Co-conspirator 6 at 5946 W. Oak Ave, Visalia, CA, and that Co-conspirator 7 was subsequently arrested with a portion of the methamphetamine.

## M. UM9106 Distributes Methamphetamine

### 1. Intercepted Communications, Surveillance and Delivery of Methamphetamine to a Co-conspirator

94. During Wire Intercept 1:26-SW-0018-JLT, multiple communications were intercepted between **UM9106** using Target Telephone 3, and an individual believed to be Co-conspirator 8 using phone number 559-604-2142. On March 11, 2026, at approximately 11:45 AM, a phone call was intercepted to **UM9106** using Target Telephone 3 from Co-conspirator 8using 559-604-2142. This phone call occurred in Spanish and the following is an English translation produced by bilingual monitors assigned to this investigation.

---

[17] This methamphetamine was submitted to the DEA Western Regional Laboratory, analyzed, and confirmed to be methamphetamine.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| **UM9106** | Hello. |
| CO-CONSPIRATOR 8 | Where are you? |
| **UM9106** | Here at the house, dude. |
| CO-CONSPIRATOR 8 | I needed that shit. |
| **UM9106** | Yes. [voices overlap]. A Michelin? |
| CO-CONSPIRATOR 8 | Three. |
| **UM9106** | Three of what? |
| CO-CONSPIRATOR 8 | "Micheladas." |
| **UM9106** | Okay. Okay, dude. Are you there at your house? |
| CO-CONSPIRATOR 8 | Yes. |
| **UM9106** | All right. |
| CO-CONSPIRATOR 8 | All right. |
| | **[End of call]** |

95. During this phone call, CCo-conspirator 8 stated, "I needed that shit" and subsequently provided a quantity of "three" and a description of "Micheladas." I know, based on my training and experience, that drug traffickers will often use coded language to arrange drug transactions. When Co-conspirators are in an established criminal relationship, their communications will often be limited in nature, reflecting only the amount of controlled substances to be transacted. I believe that this is the context of the above communication. I believe that Co-conspirator 8 used the term "shit" to refer to methamphetamine, the controlled substance which **UM9106** is known to supply. The term "Micheladas" is Spanish word and slang for half. I know that methamphetamine is often transacted in half pound quantities. Therefore, three Micheladas would be consistent with approximately three half pounds, or a pound and a half of methamphetamine, which I believe Co-conspirator 8 was ordering from **UM9106**. At the end of the conversation, Co-conspirator 8 confirmed that he (Co-conspirator 8) was at his (Co-conspirator 8's) "house." Based on this statement, I believe that **UM9106** was intending to transport the methamphetamine to Co-conspirator 8's location to complete the transaction.

96. At approximately 12:14 PM, utilizing a remote-controlled video surveillance camera, surveillance observed **UM9106** walk from 1116 W. Porter Ave, Visalia, CA carrying a brown paper shopping bag. **UM9106** entered his Toyota Tacoma[18] with the bag and departed, followed by surveillance. Surveillance followed **UM9106** as he began traveling toward the subscriber address of 1601 E. Sunnyview Ave, Visalia, CA.

97. At approximately 12:18 PM, a phone call was intercepted to **UM9106** using Target Telephone 3 from Co-conspirator 8 using phone number 559-604-2142. This phone call occurred while **UM9106** was traveling toward UM2142's residence. This phone call occurred in Spanish and the following is an English translation produced by bilingual monitors assigned to this investigation.

| **NAME** | **TRANSLATION** |
|---|---|
| | **[Beginning of call]** |
| **UM9106** | I am going to arrive here, dude in about two (2) minutes. |
| CO-CONSPIRATOR 8 | All right dude. Thank you. |
| **UM9106** | All right, then. |
| | **[End of call]** |

98. During this phone call, **UM9106** stated that he was two minutes from Co-conspirator 8's location. I believe that this statement was confirmation that **UM9106** was transporting methamphetamine to Co-conspirator 8's location.

99. At approximately 12:22 PM, surveillance observed **UM9106**'s Toyota Tacoma turn into the neighborhood where 1601 E. Sunnyview Ave, Visalia, CA is located. This residence is located on a cul-de-sac which contains multiple parking stalls for guest vehicles. Surveillance momentarily lost contact with **UM9106**'s Toyota Tacoma upon entering the neighborhood but re-acquired the vehicle parked in one of the guest parking stalls in close proximity to 1601 E. Sunnyview Ave, Visalia, CA. Surveillance observed a vehicle registered to Co-conspirator 8 parked in the driveway of 1601 E. Sunnyview Ave, Visalia, CA.

---

[18] During this investigation, **UM9106** has consistently been observed operating a white Toyota Tacoma with CA licenses plate #78932B3.

100. At approximately 12:37 PM, surveillance observed **UM9106** exit a side pedestrian gate on the west side of 1601 E. Sunnyview Ave, Visalia, CA. **UM9106** was empty handed when he departed this location and return to his Toyota Tacoma and departed the area.

101. Based on the above intercepted communications and surveillance, I believed that **UM9106** transported methamphetamine to Co-conspirator 8 at 1601 E. Sunnyview Ave, Visalia, CA. Surveillance was maintained on 1601 E. Sunnyview Ave, Visalia, CA in anticipation of the methamphetamine being further transacted and transported away from the residence.

102. At approximately 12:46 PM, surveillance observed an individual, subsequently identified as Co-conspirator 9, walk to the front door of 1601 E. Sunnyview Ave, Visalia, CA. Minutes later, surveillance observed Co-conspirator 9 walk away from the residence carrying a similar, if not the same, brown paper shopping bag which **UM9106** was observed departing 1116 W. Porter Ave, Visalia, CA with earlier. Based on this observation, I believe that Co-conspirator 9 received a portion of the methamphetamine which **UM9106** transported to Co-conspirator 8.

103. Surveillance was then maintained on Co-conspirator 9 as he departed with the brown paper shopping bag while driving a white Honda sedan. Surveillance followed Co-conspirator 9 to a shopping center located at 1550 N. Ben Maddox Way, Visalia, CA where he parked and remained inside his vehicle.

104. Based on the above information, coordination was conducted with a marked Visalia Police Department (VPD) patrol unit to contact Co-conspirator 9 and conduct a search of his vehicle. This law enforcement contact was initiated at approximately 1:04 PM. During this contact, Co-conspirator 9 was detained and his vehicle was searched. The brown paper shopping bag was located. Within this bag, approximately one and a half pounds of methamphetamine, packaged in three half-pound quantities, was located and seized[19]. Also located during a search of the brown paper shopping bag were multiple smaller baggies of suspected methamphetamine and black tar heroin. The seizure of the three half pound quantities of methamphetamine is consistent with the intercepted communication described above during which Co-conspirator 8 ordered a quantity of three halves from **UM9106**.

[19] This methamphetamine was submitted to the DEA Western Regional Laboratory, analyzed, and determined to be methamphetamine.

105. Based on this information, I believe that Co-conspirator 8 ordered a pound and a half of methamphetamine from **UM9106** during a series of pertinent intercepted communications. **UM9106** then delivered the methamphetamine to Co-conspirator 8 at 1601 E. Sunnyview Ave, Visalia, CA. Minutes later, Co-conspirator 9 picked up the methamphetamine from this residence and was subsequently arrested with the drugs.

### N. UM9106 Distributes Methamphetamine

#### 1. Intercepted Communications, Surveillance and Delivery of Methamphetamine to a Co-conspirator

106. On March 14, 2026, at approximately 4:30 PM, a phone call was intercepted to **UM9106** using Target Telephone 3 from Co-conspirator 10 using phone number 559-619-4436[20]. This phone call occurred in English, and the following is a transcription of the communication.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| | [Call in progress] |
| **UM9106** | Hello. |
| CO-CONSPIRATOR 10 | Hey, Bronco. |
| **UM9106** | Hey, what's up? |
| CO-CONSPIRATOR 10 | [Chuckles] Huh, nothing much. Uh…I need half a P and a QP. |
| **UM9106** | Okay. |
| CO-CONSPIRATOR 10 | [Voices overlap] And I will… |
| **UM9106** | [Voices overlap] Okay. |
| CO-CONSPIRATOR 10 | —I'm picking up the money right now. |
| **UM9106** | Okay. [Voices overlap] |
| CO-CONSPIRATOR 10 | So, I'll be home, I'll be home uh…like in twenty (20) minutes. |
| **UM9106** | Twenty (20) minutes? |
| CO-CONSPIRATOR 10 | Yeah. |
| **UM9106** | Okay, uh I'm right now, like in one ninety-eight (198) to Visalia. |
| CO-CONSPIRATOR 10 | Okay. |
| **UM9106** | Uh, yeah, like a uh give me like, like thirty (30) minutes something like that, but [U/I]. |
| CO-CONSPIRATOR 10 | Okay. |
| **UM9106** | Okay. |
| CO-CONSPIRATOR 10 | Half and QP. |
| **UM9106** | Okay, QP and half huh? |
| CO-CONSPIRATOR 10 | Yeah. |
| **UM9106** | Okay, bye. |
| CO-CONSPIRATOR 10 | All right bye. |
| | **[End of call]** |

[20] Phone number 559-619-4436 is subscribed to S. BORGES and, as will subsequently described, confirmed to be in his possession during his arrest.

107. During this phone call, Co-conspirator 10 referred to **UM9106** as "Bronco." This is a nickname **UM9106** commonly referred to himself as during intercepted communications. During their conversation, Co-conspirator 10 ordered "half a P and a QP" from **UM9106**. I know, based on my training and experience, that a "P" is a common code word used to refer to a pound of methamphetamine. Therefore, half a P was a reference to half a pound of methamphetamine and QP was a reference to a quarter pound of methamphetamine. I further know that methamphetamine is commonly transacted in half pound and quarter pound quantities. In anticipation of the transaction, Co-conspirator 10 stated that he was "picking up the money" and would meet **UM9106** in "twenty 20 minutes." Toward the end of this communication, **UM9106** and Co-conspirator 10 confirmed the quantity of methamphetamine to be transacted.

108. In anticipation of **UM9106** delivering methamphetamine to Co-conspirator 10, surveillance was focused at 1116 W. Porter Ave, Visalia, CA via a remote-controlled video surveillance camera. At approximately 5:31 PM, surveillance observed **UM9106** depart this location in his Toyota Tacoma.

109. At approximately 5:45 PM, a phone call was intercepted from **UM9106** using Target Telephone 3 from an unidentified female (UF4436) using Co-conspirator 10' phone number of 559-619-4436. This phone call occurred in English and the following is a transcript of this phone call.

| NAME | TRANSLATION |
|---|---|
| | **[Beginning of call]** |
| | [Call in progress] |
| UF4436 | Hey, Bronco. |
| **UM9106** | Hey, uh he's, he's home? |
| UF4436 | Yeah, yeah. Let me, let me uh… give him the phone. |
| **UM9106** | I be there in like in, like, like two (2), three (3) minutes. |
| UF4436 | Okay. [Voices overlap] |
| **UM9106** | I'll be there. |
| UF4436 | Okay, I'll let ém know. |
| **UM9106** | Okay. |
| UF4436 | All right bye. [Background noise] |
| | **[End of call]** |

110. Based on this phone call occurring over Co-conspirator 10' cell phone, I believed it was in regard to the pending methamphetamine transaction previously discussed. However, instead of Co-conspirator 10, an unidentified female (UF4436) was using phone number 559-619-4436. During this phone call, UF4436 also referred to **UM9106** as "Bronco." **UM9106** asked if "he" was home and UF4436 affirmed indicating she would give "him" the phone. Based on the previous intercepted communication, I believe that **UM9106** and UF4436 were referring to Co-conspirator 10. **UM9106** then stated he would be at UF4436's location in two to three minutes. I believe that **UM9106** was informing UF4436, and therefore Co-conspirator 10, of when he (**UM9106**) would be arriving to supply the methamphetamine within minutes.

111. Utilizing ping and cell tower location being received from Target Telephone 3, **UM9106**'s Toyota Tacoma was located at a rural address located at 8820 Ave 280, Visalia, CA. A 2003 Ford Pickup with CA license plate #88183D2, registered to Co-conspirator 10, was also observed on the property. Based on the above intercepted communications and surveillance confirming vehicles associated with **UM9106** and Co-conspirator 10 were present together, I believe that **UM9106** and Co-conspirator 10 were meeting at this location to complete the methamphetamine transaction. In anticipation of the methamphetamine departing this location and being further transacted, a VPD marked patrol unit was arranged to conduct a stop on S. BORGES upon departure.

112. At approximately 7:21 PM, surveillance observed Co-conspirator 10's vehicle depart 8820 Ave 280, Visalia, CA. This vehicle was followed by surveillance toward, Goshen, CA where a vehicle stop was initiated by a marked VPD patrol unit. Co-conspirator 10 and Individual 1 were identified as the occupants of the vehicle. During a subsequent search of the vehicle, approximately 272 grams of methamphetamine was seized[21]. The methamphetamine was packaged in three separate plastic baggies of various amounts. A cell phone was located in Co-conspirator 10's' possession and confirmed to be phone number 559-619-4436 during a controlled phone call to this device.

113. Based on the above intercepted communications, I believe that Co-conspirator 10 had ordered the methamphetamine from **UM9106**, that **UM9106** had delivered the methamphetamine to Co-

[21] This methamphetamine was submitted to the DEA Western Regional Laboratory, analyzed, and determined to be methamphetamine.

conspirator 10 at 8820 Ave 280, Visalia, CA, and that Co-conspirator 10 was in possession of the methamphetamine upon arrest.

### O. PLASCENCIA Transports Methamphetamine

#### 1. Intercepted Communications, Surveillance and Other Information Confirming PLASCENCIA was Involved in the Transportation of Methamphetamine

114. During Wire Intercept 1:26-SW-00108-JLT, a pattern of criminal activity was observed indicating **PLASCENCIA** utilized multiple vehicles to transport drugs and drug proceeds to and from his residence of 1116 W. Porter Ave, Visalia, CA. The following is a summary of the first identified pattern.

115. Between September 3, 2026 and September 5, 2026, multiple phone calls were intercepted between **UM9106** and various drug customers attempting to obtain methamphetamine. However, **UM9106** indicated he was low or out of methamphetamine and was anticipating a forthcoming shipment.

116. For example, on September 3, 2026, at approximately 9:31 PM, a phone call was intercepted to **UM9106** using Target Telephone 6 from an individual believed to be Co-conspirator 8 using phone number 619-254-4769. During this phone call, Co-conspirator 8 asked **UM9106** for a "Micha." I believe this term was a shortened word for "Michelada", a code word consistently used during this investigation to refer to a half pound of methamphetamine. **UM9106** responded that he only had two "ounces" left but was anticipating more over the weekend. I know, based on my training and experience, that methamphetamine is frequently transacted in ounce quantities. Therefore, I believe that Co-conspirator 8 wanted to purchase a half pound of methamphetamine but **UM9106** informed him that only ounce quantities were left.

117. Another example occurred on September 5, 2026. On that date, at approximately 4:41 PM, a phone call was intercepted to **UM9106** using Target Telephone 4 from Co-conspirator 11 using phone number 559-772-5145. This phone call occurred in English and the following is a transcript of the communication.

| **NAME** | **TRANSCRIPT** |
|---|---|
| | **[Beginning of call]** |
| **UM9106** | [Background: noise] Manuel. |

| | |
|---|---|
| CO-CONSPIRATOR 11 | Hey, what's up? |
| **UM9106** | Yeah, [U/I]. Hey, I'm onna… I'm, I'm trying to, uh, I'm gonna get "something" from right here, like, uh, uh, give me just, a little… couple hours and I'm gonna get "something". |
| CO-CONSPIRATOR 11 | Oh, yeah. Okay, you don't, you don't have nothing, huh? |
| **UM9106** | Yeah. Yeah, like about, give me a couple hours and then we're going to have "something". |
| CO-CONSPIRATOR 11 | Okay. |
| **UM9106** | And I go straight to you. |
| CO-CONSPIRATOR 11 | Okay. Thank you. |
| **UM9106** | Okay. Okay. Bye. |
| CO-CONSPIRATOR 11 | Bye. |
| | **[End of call]** |

118. During this investigation, Co-conspirator 11 was established as a methamphetamine customer being supplied by **UM9106**. During this intercepted communication, **UM9106** stated, "I'm gonna get something", and provided a time frame of a "couple hours." Co-conspirator 11 then asked, "you don't have nothing, huh?" **UM9106** again stated he would have something in "a couple hours." Based on their established criminal relationship, I believe that **UM9106** was informing Co-conspirator 11 that he would have methamphetamine for distribution later that day.

119. In support of this investigation, surveillance was being conducted at 1116 W. Porter Ave, Visalia, CA via a remote-controlled video surveillance camera as well as periodic direct surveillance. Upon the wire intercept being initiated, **PLASCENCIA** was observed arriving and departing in a Nissan sedan with Nevada license plate 8812D4. A records check revealed that this vehicle was an Enterprise rental vehicle which was previously rented by **PLASCENCIA** on August 22, 2026. A further records check indicated **PLASCENCIA** frequently rents vehicles from Enterprise with the most recent rentals occurring on May 1, 2026, May 29, 2026, June 8, 2026, June 19, 2026, June 26, 2026, June 29, 2026, July 9, 2026, July 10, 2026, July 23, 2026, July 26, 2026, August 14, 2026, and the most recent rental of the observed vehicle occurring on August 22, 2026. I know, based on my training and experience, that it is common for drug traffickers involved in the transportation of controlled substances, to utilize rental vehicles. There are multiple criminal purposes for utilizing a rental vehicle to transport controlled substances. First, a rental vehicle provides a level of anonymity because the registration does not return to the actual user of the vehicle. Therefore, if law enforcement is looking for a vehicle associated with a suspect, utilization of a rental vehicle would foil their efforts. Second, utilizing a rental vehicle protects

a drug traffickers' actual vehicle from asset forfeiture since a rental vehicle is owned by an innocent third party not involved in criminal activity. Lastly, if drugs are found in a rental vehicle, the drug transporter can claim ignorance stating the drugs were left over by a prior renter. I believe that **PLASCENCIA** was frequently using rental vehicles for these criminal reasons

120. At approximately 7:19 PM, via the remote-controlled video surveillance camera, **PLASCENCIA**'s Nissan sedan rental vehicle departed 1116 W. Porter Ave, Visalia, CA. Precise location information and cell site location information being obtained from Target Telephone 7 confirmed that **PLASCENCIA**[22] had departed the area of 1116 W. Porter Ave, Visalia, CA at approximately the same time, confirming **PLASCENCIA** was in his rental vehicle.

121. Also, at approximately 7:19 PM, a phone call was intercepted to **UM9106** using Target Telephone 6 from **PLASCENCIA** using phone number 559-378-4566[23]. This phone call occurred in Spanish and the following is an English translation completed by bilingual monitors assigned to this investigation.

| **NAME** | **TRANSLATION** |
|---|---|
| | **[Beginning of call]** |
| **UM9106**: | [Background: noise] Hey. |
| **PLASCENCIA**: | Hey, I'm on my way there now. I'll call you right now. |
| **UM9106**: | [Clears throat] But is the "paper "there? |
| **PLASCENCIA**: | Yes, well, no. Do the math, dude. It's just seven (7), and, and the rest is what, what do you want me to do there? What? |
| **UM9106**: | What? |
| **PLASCENCIA**: | What was there, what, the five hundred (500)? |
| **UM9106**: | Well, uh, well, when you are close, we can do the math once you… |
| | [Voices overlap] |
| **PLASCENCIA** | Okay. |
| | [Voices overlap] |

[22] Target Telephone 7 is subscribed to **Gustavo PLASCENCIA**. Target Telephone 7 was listed by **PLASCENCIA** during 27 money transfers sent or received by him between 2021 and 2026. As will be subsequently described, on September 22, 2026, **PLASCENCIA** was arrested and two cell phones were located in his custody. It was confirmed during a controlled phone call that Target Telephone 7 was one of the cell phones in **PLASCENCIA's** custody at the time of his arrest. Based on this information, I believe **PLASCENCIA** is the user of **Target Telephone 7**.

[23] **PLASCENCIA** was identified as the user of this second phone number based on a voice comparison with the user of Target Telephone 7, known to be **PLASCENCIA**. The voice comparison confirmed that that both phones had the same user, **PLASCENCIA**.

| | |
|---|---|
| **UM9106** | …it's almost all there, dude. |
| **PLASCENCIA**: | No, well, uh, is Migue's [PH] included there too? Where is it? |
| **UM9106**: | The what? |
| **PLASCENCIA**: | Migue's, Cholo's [PH]. |
| **UM9106**: | Cholo's? |
| **PLASCENCIA**: | Yes. |
| **UM9106**: | What Cholo? |
| **PLASCENCIA**: | Which one? Well, the half that uh, that uh…the six hundred (600). |
| **UM9106**: | Oh! That's all we need, that, that. |
| **PLASCENCIA**: | Well, that's what I'm telling you. Last time, I got seven (7), two (2), two hundred (200). |
| **UM9106**: | From the fifteen (15) that I got from there? |
| **PLASCENCIA**: | Well, I thought that was that too, dude. |
| **UM9106**: | No, that's fine, that's good, but, but…and what…there's… |
| **PLASCENCIA**: | Okay, well, you do your accounting. |
| **UM9106**: | [U/I] there. |
| **PLASCENCIA**: | Yes, I got it here already, I know. Well, let me go over there and we'll do some accounting once I get back. |
| **UM9106**: | Okay. Well, I almost have it all. |
| **PLASCENCIA**: | Yes, I know, I know that but you are still short. |
| **UM9106**: | Hardly, not that much. |
| **PLASCENCIA**: | Oh, no, well, we'll do some math right now. All right. |
| **UM9106**: | All right. |
| | **[End of call]** |

122. During this phone call, **PLASCENCIA** informed **UM9106** that he was traveling, stating "I'm on my way there." In response, **UM9106** asked about the "paper." I know, based on my training and experience, that the term paper is commonly used by drug traffickers to refer to drug proceeds or money intended for the purchase of controlled substances. In response, **PLASCENCIA** stated, "It's just seven." I believe that this was a reference to the amount of drugs **PLASCENCIA** intended to obtain with the "paper." **UM9106** and **PLASCENCIA** then discussed several amounts, and also referred to a third party named "Migue" AKA "Cholo" who was part of the pending transaction. While the amounts are not clearly discernable to types or quantities of controlled substances, I believe the initial reference to "paper" indicates that **UM9106** and **PLASCENCIA** were discussing various amounts of drug proceeds needed to complete the transaction. At the conclusion of the conversation, **PLASCENCIA** stated, "we'll do some accounting once I get back" and accused **UM9106** of being "short" of the drug

proceeds provided for the transaction. I believe this phone call confirmed **PLASCENCIA** had departed 1116 W. Porter Ave, Visalia, CA with drug proceeds and was in route to obtain additional drugs during this intercepted communication and that a portion of the drugs was intended for **UM9106**.

123. Precise location information and cell tower location information from Target Telephone 7 indicated that **PLASCENCIA** utilized the Nissan rental vehicle to conduct a short duration, turn around trip, to the Porterville/Terra Bella, CA area. **PLASCENCIA** then immediately traveled back to 1116 W. Porter Ave, Visalia, CA where he arrived at approximately 9:04 PM. At the time **PLASCENCIA** returned, **UM9106** was also present.

124. Within the hour of **PLASCENCIA** arriving back at 1116 W. Porter Ave, Visalia, CA, phone calls began to be intercepted between **UM9106** and various methamphetamine customers indicating **UM9106** had obtained methamphetamine which he was offering for sale.

125. Based on the above information, I believe that **PLASCENCIA** used his rental vehicle to obtain methamphetamine in the Porterville/Terra Bella, CA area, returned the methamphetamine to 1116 W. Porter Ave, Visalia, CA and that **UM9106** began transacting the methamphetamine with various customers.

126. On September 15, 2026, **PLASCENCIA** was observed by surveillance, via a remote controlled video surveillance camera, arriving at 1116 W. Porter Ave, Visalia, CA in a silver 2026 Toyota Rav4 with temporary CA license plate #DR99L47. This vehicle is registered to Maria Munoz with a listed address of 1116 W. Porter Ave, Visalia, CA.

127. On September 16, 2026, a similar pattern of activity occurred as during the September 5, 2026 shipment. Multiple communications were intercepted between **UM9106** and his various methamphetamine customers during which **UM9106** indicated he was out of methamphetamine and was awaiting a shipment. At approximately 12:20 PM, **PLASCENCIA** was observed departing 1116 W. Porter Ave, Visalia, CA in the Rav4. Precise location and cell tower information being obtained from Target Telephone 7 indicated **PLASCENCIA** conducted a short, turnaround trip to the Los Angeles, CA area. Upon returning back toward the Central Valley, communications were intercepted between **UM9106** and methamphetamine customers confirming a shipment was in route.

128. At approximately 7:40 PM, the Rav4 returned to 1116 W. Porter Ave, Visalia, CA

indicated **PLASCENCIA** had arrived with the methamphetamine shipment. Within the hour of **PLASCENCIA** arriving back at 1116 W. Porter Ave, Visalia, CA, phone calls began to be intercepted between **UM9106** and various methamphetamine customers indicating **UM9106** had obtained methamphetamine which he was offering for sale.

**2. Arrest of PLASCENCIA on September 22, 2026 while Transporting Suspected Methamphetamine**

129. On September 22, 2026, a border crossing check indicated that **PLASCENCIA** had crossed the US/Mexico boarder into the United States at the San Ysidro Port of Entry while driving a white Nissan SUV with CA license plate #9HFS316. Precise location information and cell tower location being received from Target Telephone 7 confirmed he was traveling northbound on Interstate 5 towards Los Angeles, CA.

130. At approximately 7:39 PM, a phone call was intercepted to **UM9106** using Target Telephone 6 from a Co-conspirator who was one of **UM9106**'s most consistent methamphetamine customers. During this phone call, **UM9106** stated "it's on the way." The Co-conspirator asked if it would arrive on "Thursday." **UM9106** stated that it would be there "tonight." The Co-conspirator stated that she wanted the other "half". **UM9106** stated that the "guy" is "coming" and asked the Co-conspirator to wait "a couple of hours." I believe that **UM9106** was informed that **PLASCENCIA** was traveling back toward him, would have a shipment of methamphetamine to distribute, and was informing the Co-conspirator of this.

131. At approximately 8:00 PM, precise location information received from Target Telephone 7, showed that **PLASCENCIA** deviated from I-5 towards South Central Los Angelas, CA which was the same general location **PLASCENCIA** traveled to on September 16, 2026, to obtain a shipment of methamphetamine.

132. Based on this information, I anticipated that **PLASCENCIA** would be returning with a shipment of methamphetamine and coordination was conducted with a marked CHP patrol unit to conduct a stop on **PLASCENCIA**. Based on precise location information and cell tower information being obtained from Target Telephone 7, physical surveillance was able to be established on **PLASCENCIA** south of Bakersfield, CA. **PLASCENCIA** was followed to Delano, CA where the

vehicle stop was initiated. **PLASCENCIA** was identified as the sole occupant of the Nissan SUV and during a subsequent search of the vehicle, approximately ten pounds of suspected methamphetamine[24] was located and seized. As with the two prior methamphetamine shipments on September 5, 2026 and September 16, 2026, I believe **PLASCENCIA** was attempting to return to 1116 W. Porter Ave, Visalia, CA where the methamphetamine would have been distributed by **UM9106**.

## II. REQUEST FOR SEALING

133. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the records relate to an ongoing investigation that includes multiple targets who have not yet been apprehended. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness. Such a disclosure would give the targets an opportunity to notify confederates, change patterns of behavior and/or take steps to destroy evidence.

## III. CONCLUSION

134. Based on the totality of facts set forth in this affidavit, I believe there is probable cause to believe that the defendants committed the following violations:

a) **Fidel VASQUEZ (VASQUEZ)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a).

b) **Xavier MEDRANO, aka "Viejo", (MEDRANO)** with conspiracy to distribute and possess with intent to distribute methamphetamine and fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(a).

c) **First Name Unknown, Last Name Unknown, aka "BRONCO", aka "Luis", (UM9106)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a).

d) **Gustavo PLASCENCIA-Munoz, (PLASCENCIA)** with conspiracy to distribute and

[24] A presumptive test was conducted on the suspected methamphetamine which returned presumptive positive for methamphetamine.

possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a).

e) **Arturo LEON (A. LEON)** with conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a).

f) **Hector AVELAR (AVELAR)** with conspiracy to distribute and possess with intent to distribute fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(a).

135. I respectfully request the issuance of arrest warrants for individuals listed above..

I declare under penalty of perjury that the facts contained herein are true and correct to the best of my knowledge and belief.

Shawn Riley, Special Agent
Drug Enforcement Administration

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed.R.Crim. P. 4.1 and 41(d)(3) this 23 day of October, 2026.

The Honorable Erica P. Grosjean
United States Magistrate Judge

Approved as to form and substance:

/s/ Antonio J. Pataca
Antonio J. Pataca
Assistant United States Attorney

**PENALTY SLIP**

| | |
|---|---|
| **DEFENDANTS:** | FIDEL VASQUEZ;<br>XAVIER MEDRANO, AKA "VIEJO";<br>FIRST NAME UNKNOWN, LAST NAME UNKNOWN,<br>AKA "BRONCO", AKA "LUIS", (UM9106);<br>GUSTAVO PLASCENCIA-MUNOZ;<br>ARTURO LEON; |
| **COUNT:** | **Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine** |
| **VIOLATION:** | 21 U.S.C. §§ 846, 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life<br>$100 Special Assessment |
| **DEFENDANTS:** | XAVIER MEDRANO, AKA "VIEJO";<br>HECTOR AVELAR |
| **COUNT:** | **Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl** |
| **VIOLATION:** | 21 U.S.C. § 841(a)(1) |
| **PENALTY:** | Mandatory minimum of 10 years in prison and up to life; or<br>Fine of up to $10,000,000; or both fine and imprisonment<br>Supervised release of at least 5 years and up to life<br>$100 Special Assessment |